No. 113,098

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

NAVID YEASIN,
*Appellee*,

v.

UNIVERSITY OF KANSAS,
*Appellant.*

SYLLABUS BY THE COURT

1.

Parties in an agency action before the district court under the Kansas Judicial Review Act may appeal the district court's decision to the appellate courts, just as parties do in other civil cases. An appellate court then exercises the same statutorily limited review as though the petition for review had been directly filed in the appellate court.

2.

Appellate courts no longer apply the doctrine of operative construction or extend deference to an agency's or board's statutory interpretation.

3.

An appellate court exercises unlimited review on questions of statutory interpretation without deference to a university's interpretation of its student code.

Appeal from Douglas District Court; ROBERT W. FAIRCHILD, judge. Opinion filed September 25, 2015. Affirmed.

*Sara L. Trower*, associate general counsel and special assistant attorney general, for appellant.

*Terence E. Leibold*, of Petefish, Immel, Heeb & Hird, LLP, of Lawrence, for appellee.

*Stephen Douglas Bonney*, for amicus curiae ACLU Foundation of Kansas.

*Don Saxton*, for amici curiae Student Press Law Center and Foundation for Individual Rights in Education.

*Maureen A. Redeker* and *Peter J. Paukstelis*, for amicus curiae Kansas State University.

Before GREEN, P.J., HILL, J., and TIMOTHY G. LAHEY, District Judge, assigned.

HILL, J.: During the summer break of 2013, Navid Yeasin engaged in reprehensible, demeaning, and criminal behavior with W., who is also a University of Kansas student. In addition, Yeasin posted a series of puerile and sexually harassing tweets on his account. None of this conduct occurred on campus or at a University sponsored or supervised event. The Student Code, the rules by which the University can impose discipline upon its students, deals only with conduct on campus or at University sponsored or supervised events. We therefore hold that the University had no authority to expel Yeasin. We affirm the district court's similar ruling and dissolve the stay order issued in this case.

*The dating relationship of two students deteriorates.*

Yeasin and W. met during the fall semester of 2012 when both students were enrolled in the same geology class at the University of Kansas. They dated off and on from November 2012 through May 2013. Their relationship was turbulent.

In late June 2013, Yeasin drove W. to see her therapist. While she was at her therapy session, Yeasin stayed in the car and read text and Facebook messages on W.'s

2

phone. When W. returned, Yeasin angrily confronted W. about some messages she had sent to another man. The argument continued as they drove around Olathe. W. told Yeasin she did not want to spend the day with him and to take her back to her car. Yeasin became angry again but agreed.

Once at W.'s car, Yeasin took W.'s phone, locked the car doors, and then drove away with W. Yeasin told W. that he was going to make her pay for what she had done. W. repeatedly asked Yeasin to let her out of the car, and he refused. Yeasin also refused to return W.'s phone and physically prevented her from taking her phone back. When W. told Yeasin that she was scared and to take her home, Yeasin responded, "'[N]o, not until you pay the consequences for what you've done and make sure you'll never do this again.'" Sometime between 5 p.m. and 6 p.m., Yeasin took W. back to the parking lot where her car was parked. W. left when a friend picked her up in the parking lot around 10 p.m. Yeasin called W. around 1 a.m. threatening her, and at one point told her he "would make it so that [W.] wouldn't be welcome at any of the universities in Kansas."

W. reported this confrontation to the police. The State charged Yeasin with criminal restraint, battery, and criminal deprivation of property. Yeasin subsequently entered into a diversion agreement with the State on the criminal charges in August 2013. In a companion case, the Johnson County District Court issued a final order of protection from abuse directing Yeasin to have no contact with W. for 1 year.

*Yeasin's victim complains to the University authorities.*

Back on campus in August 2013, W. filed a complaint with the Office of Institutional Opportunity and Access. Generally known by the acronym IOA, it is the office responsible for investigating complaints of discrimination and harassment at the University.

3

On August 8, 2013, an IOA investigator, Jennifer Brooks, interviewed W. regarding her complaint. The IOA opened an investigation. That same day, Yeasin tweeted, "On the brightside you won't have mutated kids. #goodriddens." About a week later, IOA Investigator Steve Steinhilber interviewed Yeasin regarding the complaint. Steinhilber advised Yeasin of his rights and responsibilities during the investigation.

After considering the Johnson County District Court's final protection from abuse order, the IOA decided to issue a no-contact order because Yeasin had engaged in abusive and threatening behavior that made W. afraid to be on campus and continued to post tweets regarding W., which were creating further distress and fear. Specifically, the no-contact order warned Yeasin of possible expulsion:

>"You are hereby informed that this 'no contact' order means that you understand you are prohibited from initiating, or contributing through third-parties, to any physical, verbal, electronic, or written communication with [W.], her family, her friends or her associates. This also includes a prohibition from interfering with her personal possessions. . . . Moreover, retaliation against persons who may pursue or participate in a University investigation, whether by you directly or by your associates, is a violation of University policy.
>"A violation of this ruling could result in . . . formal removal from the premises and a recommendation for further conduct sanctioning; including, but not limited to, suspension and expulsion from the University."

That same evening, Yeasin tweeted, "'Jesus Navid, how is it that you always end up dating the psycho bitches?' #butreallyguys." The next day, on August 15, 2013, Yeasin tweeted, "'Oh right, negative boob job. I remember her.'" A week later on August 23, 2013, Yeasin tweeted, "'If I could say one thing to you it would probably be "Go fuck yourself you piece of shit." #butseriouslygofuckyourself #crazyassex.'" Then, on September 5, 2013, Yeasin tweeted, "'Lol, she goes up to my friends and hugs them and then unfriends them on Facebook. #psycho #lolwhat.'"

4

On September 6, 2013, W. told Brooks about the August 23, 2013, tweet Yeasin posted. That same day, Brooks sent Yeasin an email to clarify that even though the August 23, 2013, tweet Yeasin posted did not identify W. by name, the tweet was a form of communication in violation of the no-contact order. Brooks gave Yeasin a second warning that "[g]oing forward, if you make any reference regarding [W.], *directly or indirectly*, on any type of social media or other communication outlet, you will be immediately referred to the Student Conduct Officer for possible sanctions which may result in expulsion from the University." (Emphasis added.)

Some 7 hours later, on September 7, 2013, Yeasin tweeted, "lol you're so obsessed with me you gotta creep on me using your friends accounts #crazybitch." Then, on September 13, 2013, Yeasin tweeted, "30 Reasons to Love Natural Breasts totalfratmove.com/30-reasons-to-. . .via@totalfratmove #doublenegativeboobjob."

On September 17, 2013, the IOA Executive Director Jane McQueeney, concerned that Yeasin's "behavior was escalating" and that he did not understand the no-contact order, conducted a follow-up interview with Yeasin.

At that interview, McQueeney reiterated to Yeasin that both the protection order and no-contact order forbade direct and indirect contact with W. Yeasin acknowledged understanding the no-contact order as meaning he was not to contact W. and stated, "'the twitter thing was a lapse on my part.'" Yeasin expressed that it had not occurred to him that a tweet would be a violation of the protection order or no-contact order and that he had not intended his tweets to reach W. Yeasin stated that he did not post any other tweets about W. after receiving the September 6, 2013, email from Brooks. Yeasin did admit to posting the August 8, 2013, and August 23, 2013, tweets and confirmed they were both about W. However, he claimed that the September 7, 2013, tweet using the hashtag "crazybitch" referred to someone else, not W., and that only the hashtag "#crazyassex" or "#psycho" would be referring to W. Yeasin acknowledged that the

5

August 8, 2013, tweet might have been referring to W.'s "'spine thing'" and that he knew W. had gotten breast implants and had inherited a rib cage deformity but claimed that the September 13, 2013, tweet was not about W., her medical issues, or her surgery. Yeasin told McQueeney that he would not tweet anything that could be perceived as being directed at W. and he recognized doing so was a violation of both the protection order and the no-contact order.

The IOA completed its investigation and issued a report to Tammara Durham, Vice Provost of Student Affairs. The report recommended that disciplinary action should be taken against Yeasin. The IOA report concluded that "while some of the conduct in this case occurred off campus this past summer," the preponderance of the evidence nevertheless showed that Yeasin's conduct had affected the on-campus environment for W., thus violating the University's sexual harassment policy. The IOA also found that Yeasin knowingly and purposefully violated the no-contact order by continually "harassing" W. on social media even after being informed that this indirect contact was in violation of that no-contact order. The IOA communicated its findings and recommendations to Yeasin the same day and reiterated to him that the no-contact order remained in effect.

After receiving the IOA report, the Director of Student Conduct & Community Standards, Nicholas Kehrwald, set a formal hearing and gave notice to Yeasin. Pointing to the IOA's findings, Kehrwald repeated the allegations against Yeasin and specified that Yeasin's conduct violated Article 22.A.1 of the Student Code, the University's sexual harassment policy, and the no-contact order. Kehrwald complained of Yeasin's conduct off campus having an effect on campus:

> "[R]epeatedly posting demeaning tweets referenced at [W.], physically restraining [W.]
> in your car on July 1, 2013. IOA's finding was based on the fact that you held [W.],
> against her will, for three hours in your car, yelled at [W.], called her demeaning names,

6

and threatened suicide when she attempted to break-up with you. The record also indicates that you have had electronic communications directed at [W.] after August 14, 2013. While some of these actions have occurred off-campus, the record demonstrates the relationship and behavior has had on-campus [effects] for [W.]"

Kehrwald advised Yeasin that a formal student conduct hearing would be held on November 4, 2013, and the no-contact order remained in effect.

On October 23, 2013, Yeasin tweeted, "'At least I'm proportionate.' #NDB #boobs @MorganLCox."

At the student conduct hearing, the hearing panel told Yeasin that the charges against him were for violating Article 22.A.1 of the Student Code and the University's sexual harassment policy. The hearing panel then reviewed the written documents from the case file and then heard from W., IOA Executive Director McQueeney, IOA Investigators Steinhilber and Brooks, and Yeasin.

The hearing panel found that Yeasin more likely than not had violated both Article 22.A.1 and the University's sexual harassment policy.

In the panel's view, Yeasin's behavior threatened the physical health, welfare, and safety of W. Specifically, the panel focused on Yeasin's off-campus actions:

"Yeasin physically restrained [W.] in his car, yelled at her for hours and demonstrated hostile, controlling and unstable behavior, making [W.] afraid for her safety. [W.] repeatedly expressed during the time she was restrained in the car, 'I am scared. I am scared for my safety. [. . .] I do not feel safe.'"

Then, citing various tweets Yeasin posted after the no-contact order and the September 7, 2013, tweet Yeasin posted after receiving the September 6, 2013, email from the IOA

7

clarifying the no-contact order, the hearing panel also found that Yeasin had violated the no-contact order:

> "Yeasin repeatedly followed and attempted to make unwanted contact, including but not limited to physical or electronic contact with [W.] via text message, twitter and in person after the no-contact order had been delivered to Yeasin, and after IOA had made clarification with Yeasin that any reference regarding W., directly or indirectly, was a violation of the no-contact order."

In concluding that Yeasin violated the University's sexual harassment policy, the hearing panel found "the behavior of Yeasin is unwelcome, based upon sex or sex stereotypes, and are so severe, pervasive and objectively offensive that they have the purpose or effect of substantially interfering with [W.'s] academic performance or participation in the University's programs and activities."

To support its findings, the panel cited Yeasin's off-campus conduct towards W. on June 29, 2013, his threat towards W. on the morning of June 30, 2013, "indicating he would make the University of Kansas campus environment so hostile, W. would not attend any university in the state of Kansas," and statements made by W. about the impact of her relationship with Yeasin and his actions.

The hearing panel recommended that Yeasin be expelled permanently and banned from the University campus until W. graduated.

After reviewing the complaint, the evidence presented at the formal hearing, and the hearing panel's sanction recommendations, Vice Provost Durham agreed with the hearing panel. The University expelled Yeasin and banned him from campus for violating Article 22.A.1 and the University's sexual harassment policy. In her November 13, 2013, decision letter, Vice Provost Durham found:

8

- Yeasin's "conduct on June 28, 2013 and subsequent electronic communication was so severe, pervasive and objectively offensive that it interfered with [W.'s] academic performance and equal opportunity to participate in and benefit from University programs and activities";

- Yeasin's tweets referencing W. both on and after August 14, 2013, violated the no-contact order and the September 6, 2013, clarifying email;

- the combination of Yeasin's conduct on June 28, 2013, and violation of the no-contact order and the September 6, 2013, clarifying email qualified as a violation of the University's sexual harassment policy, specifically "unwelcome comments about W.'s body, unwelcome physical closeness, and unwelcome jokes or teasing of a sexual nature";

- Yeasin's behavior threatened the physical health, welfare, and safety of W. in violation of Article 22.A.1; and

- Yeasin's conduct "created an imminent threat of danger to W. on campus and unreasonably obstructed and interfered with her learning environment."

Yeasin appealed his expulsion to the University Judicial Board. The Board denied him any relief. With this denial, Yeasin had exhausted his administrative remedies. He then sought judicial review of the University's actions.

*How the district court handled this matter.*

After pointing out that the University presented no evidence that the conduct set forth as the basis for the alleged Article 22 Student Code violation occurred on campus or at a University sponsored event, the district court found that the Student Code, as written, did not apply to off-campus conduct. Specifically, Article 22 of the Student Code stated that the misconduct in question must occur on campus or at University sponsored events. The language relied upon by the University from Article 20—"or as otherwise required by federal, state or local law"—was ambiguous as to providing notice of what conduct

9

was subject to disciplinary action. Article 18, in contrast, provided specific notice when the University may initiate proceedings for conduct violating federal, state, or local law and that such conduct must occur on campus.

Next, given its finding that the University erroneously interpreted the Student Code by applying it to off-campus conduct, the district court found that the University's decision that Yeasin violated Article 22 was not supported by substantial evidence because it failed to establish that Yeasin's conduct occurred on campus or at a university-sponsored event.

The district court ordered that the University readmit Yeasin, reimburse or credit Yeasin for his fall 2013 semester tuition and fees that he paid, and pay the transcript fees. However, the court issued a stay order at the University's request.

The University appeals the district court's grant of relief to Yeasin, and Yeasin cross-appeals the district court's stay of judgment. The American Civil Liberties Union Foundation of Kansas; the Foundation for Individual Rights in Education, Inc., and Student Press Law Center; and Kansas State University each submitted an amicus curiae brief in support of Yeasin.

*We list the pertinent rules and policies.*

This action is brought as a judicial review of agency actions according to the Kansas Judicial Review Act, K.S.A. 2014 Supp. 77-601 *et seq.* Parties in an agency action before the district court under the KJRA may appeal the district court's decision to the appellate courts, just as parties do in other civil cases. K.S.A. 77-623. We exercise the same statutorily limited review as though Yeasin's petition had been directly filed in this court. See *Kansas Dept. of Revenue v. Powell*, 290 Kan. 564, 567, 232 P.3d 856 (2010). Contrary to the University's wishes, we no longer apply the doctrine of operative

construction or extend deference to an agency's or board's statutory interpretation. In *Douglas v. Ad Astra Information Systems*, 296 Kan. 552, 559, 293 P.3d 723 (2013), the court held that the doctrine of operative construction has been abandoned, abrogated, disallowed, disapproved, ousted, overruled, and permanently relegated to the history books where it will never again affect the outcome of an appeal. *In re Tax Appeal of LaFarge Midwest*, 293 Kan. 1039, 1044, 271 P.3d 732 (2012). Thus, this court exercises unlimited review on questions of statutory interpretation without deference to the University's interpretation of its Student Code. See *Ft. Hays St. Univ. v. University Ch., Am. Ass'n of Univ. Profs.*, 290 Kan. 446, 457, 228 P.3d 403 (2010).

The University's Student Code and sexual harassment policy controls the issues arising in this case. The purpose of the Student Code is to outline the rights of students and many of the standards of conduct expected within the University's community. The Student Code advises that students must "adhere to all published rules, regulations and policies" and the failure to do so may subject a student to disciplinary action. The record on appeal discloses that posttrial, the University advised the district court that in light of its decision, the Student Code has been revised. Those revisions are not in the record and they did not affect the district court's decision. We do not consider those revisions either.

The Student Code and the various University policies create a comprehensive regulatory scheme for the discipline of students. The following specific provisions of the Student Code bear on the issues presented in this case.

Under the Bill of Rights section, Article 2.A guarantees the right of freedom of expression. Article 2.C recognizes the right of a student to be "free from harassment or discrimination based on . . . sex." That article also directs the aggrieved student to University policies on sexual harassment for further guidance and clarifies that the IOA is responsible for inquiries regarding the University's nondiscrimination policies.

11

Article 18, under the heading "Violation of Law and University Discipline," describes the University's ability to hold a student accountable for his or her conduct that violates the law and the Student Code. The University can proceed against a student and not wait for the outcome of any prosecution:

> "*If a violation of federal, state or local law occurs on campus* and is also a violation of a published University regulation, the University may institute its own proceedings against an offender who may be subjected to criminal prosecution. Proceedings under the Code may be carried out prior to, simultaneously with or following civil or criminal proceedings without regard to the pendency of civil or criminal litigation in court or criminal arrest and prosecution." (Emphasis added.)

Article 20, which falls under the heading "Privacy," is situated between two articles describing a student's right to privacy and the protection of a student's educational records. It provides:  "The University may not institute disciplinary proceedings unless the alleged violation(s) giving rise to the disciplinary action *occurs on University premises or at University sponsored or supervised events, or as otherwise required by federal, state, or local law*." (Emphasis added.)

Article 22 is under the heading "Conduct of Students and Organizations." It describes when a student's nonacademic misconduct is subject to disciplinary action by the University. Violations of policies, rules, and regulations can lead to discipline:

> "Students . . . are expected to conduct themselves as responsible members of the University community. *While on University premises or at University sponsored or supervised events*, students and organizations are subject to disciplinary action for violations of published policies, rules and regulations of the University and Regents, and for the following offenses: . . . . (Emphasis added.)

One of those offenses is described in Article 22.A.1, which states a student commits an offense against a person when a student

12

"[t]hreatens the physical health, welfare, or safety of another person, places another person in serious bodily harm, or uses physical force in a manner that endangers the health, welfare or safety of another person; or willfully, maliciously and repeatedly follows or attempts to make unwanted contact, including but not limited to physical or electronic contact, with another person. This prohibition includes, but is not limited to, acts of sexual assault."

Article 22.F.2 describes the limitations of sanctioning a student for nonacademic misconduct and states: "No sanctions or other disciplinary measures may be imposed against a student . . . by the University concerning non-academic conduct other than that . . . prescribed in this code."

We turn to the University's policy prohibiting sexual harassment. It states: "Sexual harassment is a violation of . . . federal and state law. Specifically, sexual harassment is a form of illegal discrimination in violation of . . . Title IX of the Education Amendments of 1972." The policy further describes sexual harassment, in part, as:

"'[C]onduct which includes physical contact, advances and comments made in person and/or by phone, text message, email or other electronic medium, that is unwelcome; based on sex or gender stereotypes; and is so severe, pervasive and objectively offensive that it interferes with a person's academic performance, employment or equal opportunity to participate in or benefit from University programs or activities.'"

These are the rules we have to work with.

Faced with a serious complaint of sexual harassment involving two students, the University took prompt action. It investigated the circumstances, separated as best it could the antagonists and removed the cause of the conflict through expulsion. The trouble is, the Student Code did not give the University authority to act when the misconduct occurred somewhere other than its campus or at University sponsored or

13

supervised events. There is no proof in the record that Yeasin posted the tweets while he was on campus.

Through every step of the disciplinary proceedings, the University relied on Article 22 of the Student Code as the basis for Yeasin's discipline. But, on appeal, the University cherry-picks a small phrase from Article 20 to argue that it did indeed have the authority to expel Yeasin for his actions in Johnson County during the summer and for his tweets in violation of the no-contact order.

The University asks us to find that the district court should have interpreted the phrase "or as otherwise required by federal, state or local law" found in Article 20 to mean that the University's jurisdiction to discipline a student for violating Article 22.A. extended to a student's off-campus conduct. The University argues that this interpretation of Article 20 is consistent with the obligations imposed on it under Title IX.

The University does not dispute that it used its student disciplinary procedure, *i.e.*, the Student Code, instead of some separate grievance procedures to resolve Title IX complaints regarding sexual harassment grievances.

The 2011 "Dear Colleague Letter" specifically warned that if the recipient to Title IX funds relies on student disciplinary procedures for Title IX compliance, it should have its Title IX coordinator review the recipient's disciplinary procedures to ensure that the procedures comply with the requirements of Title IX and then the recipient should "implement changes as needed."

The University's fears of federal reprimands arising from Title IX are not without some merit. The "Dear Colleague Letter" sent to various educational institutions across the country in 2011 is filled with advice, illustrations, and implicit warnings. The loss of

14

federal funding which the U.S. Department of Education suggests is a possibility, would be calamitous.

In particular, one example from the letter is pertinent to this case. It deals with the effect of off-campus events and the on-campus environment:

> "Schools may have an obligation to respond to student-on-student sexual harassment that initially occurred off school grounds, outside a school's education program or activity. If a student files a complaint with the school, regardless of where the conduct occurred, the school must process the complaint in accordance with its established procedures. Because students often experience the continuing effects of off-campus sexual harassment in the educational setting, schools should consider the effects of the off-campus conduct when evaluating whether there is a hostile environment on campus. For example, if a student alleges that he or she was sexually assaulted by another student off school grounds, and that upon returning to school he or she was taunted and harassed by other students who are the alleged perpetrator's friends, the school should take the earlier sexual assault into account in determining whether there is a sexually hostile environment. The school also should take steps to protect a student who was assaulted off campus from further sexual harassment or retaliation from the perpetrator and his or her associates."

Note the letter does not direct the school to take action off-campus. Instead, the letter clearly advises that the school must take steps to prevent or eliminate a sexually hostile environment. It seems obvious that the only environment the University can control is on campus or at University sponsored or supervised events. After all, the University is not an agency of law enforcement but is rather an institution of learning.

The University believes that to comply with Title IX requirements it must, and did, extend its jurisdiction to disciplining its students for off-campus misconduct. In contrast, Kansas State University contends in its amicus curiae brief that Title IX does not require a school to sanction students for off-campus conduct.

15

To resolve this first issue we need not address whether Title IX requires a recipient to Title IX funds to discipline off-campus conduct. Instead, the extent that a Title IX recipient believes it exerts jurisdiction over student conduct to comply with its Title IX obligations must be reflected in the language chosen for its student disciplinary procedures or separate procedures to resolve such complaints. In other words, if we are to agree that the University's jurisdiction to discipline students extended to off-campus misconduct, we must find that power clearly arises from the express framework of the Student Code and not because we simply accept that the authority *should* be there based on the University's own interpretation of Title IX.

In contrast to the University's position, Yeasin argues the University cannot claim Article 20 gave it jurisdiction to discipline him for off-campus conduct for two reasons. First, he argues the phrase the University relies upon in Article 20 is ambiguous, and second, the University expelled him for violating Article 22, which expressly contradicts any such interpretation of Article 20. Since Article 22 is the more specific section of the Student Code that clearly indicates where the prohibited misconduct must occur, it controls.

Every application of a text to particular circumstances entails interpretation. In determining whether a conflict between Article 20 and Article 22 exists and how to resolve any such conflict, it is useful to consider certain fundamental principles of statutory interpretation. When we deal with cases involving enactments of the legislature, the most fundamental rule of statutory construction is that the intent of the legislature governs, if that intent can be ascertained. *Bergstrom v. Spears Manufacturing Co.*, 289 Kan. 605, 607, 214 P.3d 676 (2009). An appellate court must first attempt to ascertain legislative intent through the statutory language enacted, giving common words their ordinary meanings. *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 918, 296 P.3d 1106 (2013).

When a statute is plain and unambiguous, an appellate court does not speculate as to the legislative intent behind it and will not read into the statute something not readily found in it. *In re Tax Appeal of Burch*, 296 Kan. 713, 722, 294 P.3d 1155 (2013). But when the statute's language is ambiguous, appellate courts can employ canons of construction to construe the legislature's intent. *Northern Natural Gas Co.,* 296 Kan. at 918.

Keeping these principles in mind, the claimed conflicts between the Student Code can be resolved. A careful reading of the plain language of the Student Code clarifies where the student conduct that is subject to discipline must occur.

The University argues that the Article 20 phrase "or as otherwise required by federal, state or local law" nullifies the language preceding it which indicates that it can only institute disciplinary proceedings for conduct "on University premises or at University sponsored or supervised events." The University suggests that the "or" must be read disjunctively rather than conjunctively. Basically, this argument means Article 20 is simply making a list of separate alternatives.

Clearly, there are no words in the last phrase of the sentence that mentions where these violations of other laws may occur to be punishable. The phrase is merely a reference to the laws that could be violated. This portion of Article 20 is a series of "or's," joining phrases of equal stature: "on University premises *or* at University sponsored . . . *or* supervised events . . . *or* as otherwise required by federal law . . . ." (Emphasis added.) The sentence makes a list of alternatives. There is nothing in the language of the article, or the punctuation, that compels us to hold that the last "or" in this series should be read any differently than those that come before it.

Our interpretation, which adds no language to the Article, creates no ambiguity here. The intent is clear. If there is a violation of some federal, state, or local law not

specified in the Student Code that occurs on University premises or at University sponsored or supervised events, the University can institute disciplinary proceedings against the offender. This interpretation is consistent with Article 18 of the Student Code. Other authorities can prosecute violations of those laws that occur elsewhere. The "other" authority here, of course, was the Johnson County District Attorney filing charges against Yeasin for his deplorable treatment of W.

If we construed Article 20 as the University wants, we must insert words to the effect "for conduct wherever committed." The phrase then becomes, "or as otherwise required by federal, state, or local law for conduct wherever committed." If that is what the drafters of the Student Code meant, the article could have been written in that fashion. Unlike the preceding language in Article 20, the phrase "or as otherwise required by federal, state or local law" does not specify where the conduct subject to disciplinary proceedings under federal, state, or local law must have occurred to be punishable by the University.

Furthermore, Article 20 is one of three articles located in section 16 of the Student Code entitled, "Privacy." This section deals with matters of confidentiality, not jurisdiction. Article 19 advises students that they surrender none of their privacy rights by joining the University. Article 21, in turn, deals extensively with the private nature of educational records and how the University will treat them. Within the context of privacy concerns, Article 20 advises students of procedural limitations. If its purpose was to establish when the University may institute disciplinary action or enunciate the University's jurisdiction, it lacks any heading to that effect. If that was the intended purpose, it would have been placed with or included in Article 18 in the section of the Student Code entitled, "Violation of Law and University Discipline."

We must also point out that the phrase "required by law" does not even attempt to list what type of conduct that is subject to federal, state, or local law, is being regulated,

or by affirming that the conduct relates in some way to the University's Title IX policies. The University vainly tries to pile all of this onto a phrase that is simple and straightforward.

Appellate courts strive to give effect, if possible, to the various provisions of an entire act with a view of reconciling and bringing the provisions into workable harmony. *Northern Natural Gas Co.,* 296 Kan. at 918. The University's argument that Article 20 suggests that the University may take disciplinary action for student conduct wherever it occurs, when required by federal, state, or local law, ignores all of the other pertinent articles in the Student Code. In other words, the University cannot reconcile its interpretation of the language in Article 20 with the language in Article 18 or Article 22.

More importantly, the University expelled Yeasin for conduct specifically violating Article 22 and its published sexual harassment policy. Article 20, with its reference to federal, state or local law, must be read in context within its place in the overall regulatory scheme for disciplining students for nonacademic misconduct that is found in the Student Code. We note that a student's conduct in violation of the University's published sexual harassment policy falls under Article 22, which states, "students . . . are subject to disciplinary action for violations of published policies" of the University.

Article 22 specifically directs that the only nonacademic misconduct subject to disciplinary action or expulsion is misconduct that occurs on campus or at a University sponsored event. The Student Counsel did not choose to rely solely on Article 18 to clarify its jurisdiction and eliminate the phrase, "[w]hile on University premises or at University sponsored or supervised events," nor did it expand on this phrase by referring to the public law component of Article 18 and clarifying where alleged violations falling under this language must occur.

19

Generally, specific provisions control over general provisions regarding the same subject. See *Ft. Hays St. Univ.,* 290 Kan. at 463. Because Article 18 and Article 22 both concern alleged violations of student conduct the University seeks to discipline, and they contain more specific language directing that the University's authority only extends to on-campus or at University sponsored events than the general provision in Article 20 that gives no indication as to where the misconduct must occur, the more specific statutes control.

The district court did not err in interpreting the Student Code to mean it applies only to student conduct that occurs on campus or at University sponsored activities. Accordingly, because the University erroneously interpreted the Student Code as giving it jurisdiction to discipline Yeasin for off-campus conduct and does not dispute that Yeasin's conduct giving rise to his expulsion did not occur on campus or at University sponsored events, this court need not address the second issue, *i.e.*, whether the University's decision to expel Yeasin was supported by substantial evidence.

Similarly, given our conclusion that the district court did not err in granting Yeasin's petition, we need not address the other questions before us, *i.e.*, whether Title IX permits the University to extend its jurisdiction to discipline student conduct occurring off campus and whether Yeasin's tweets were protected speech under the First Amendment to the United States Constitution.

As a final note, in view of our holding, Yeasin's cross-appeal concerning the propriety of the district court's stay order is now moot.

We affirm the district court's grant of relief, and the stay order is hereby lifted.