FILED
United States Court of Appeals
Tenth Circuit

January 5, 2018

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

NAVID YEASIN,

    Plaintiff - Appellant,

v.

TAMMARA DURHAM,

    Defendant - Appellee.

No. 16-3367
(D.C. No. 2:16-CV-02010-JAR-TJJ)
(D. Kan.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **BRISCOE**, **MATHESON**, and **PHILLIPS**, Circuit Judges.
_____

Dr. Tammara Durham, the Vice Provost for Student Affairs at the University

of Kansas, expelled Navid Yeasin from the university after finding that by physically

restraining and later tweeting indirectly but disparagingly about his ex-girlfriend, he

had violated the university's student code of conduct and sexual-harassment policy.

After Yeasin sued Dr. Durham in Kansas state court, the university reinstated him.

Yeasin then sued Dr. Durham in federal court, asserting a claim under 42 U.S.C.

§ 1983 based on his First Amendment right to freedom of speech and his Fourteenth

Amendment right to substantive due process. He argued that Dr. Durham had

_____

[*] This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel. It may be cited, however, for
its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

violated these rights when she expelled him for his off-campus online speech. Dr. Durham successfully moved to dismiss Yeasin's complaint based on qualified immunity. Yeasin appealed. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## BACKGROUND

### A. *Yeasin's Expulsion*

Yeasin and A.W. dated from the fall of 2012 through June 2013. On June 28, 2013, Yeasin physically restrained A.W. in his car, took her phone from her, threatened to commit suicide if she broke up with him, threatened to spread rumors about her, and threatened to make the University of Kansas's "campus environment so hostile, [that she] would not attend any university in the state of Kansas." Appellee's Suppl. App. at 19.

For this conduct, Kansas charged Yeasin with criminal restraint, battery, and criminal deprivation of property. On July 25, 2013, A.W. sought and obtained a protection order against Yeasin from the Johnson County District Court. The order was "entered by consent without any findings of abuse." Appellee's Suppl. App. at 3. In August 2013, Yeasin entered a diversion agreement with the state on these charges. *Yeasin v. Univ. of Kansas*, 360 P.3d 423, 424 (Kan. Ct. App. 2015).[1]

---

[1] We are entitled to take judicial notice of Yeasin's prior Kansas Court of Appeals case, just as the district court was entitled to do so, because it is a public record that "bear[s] directly upon the disposition of the case at hand." *United States v. Ahidley*, 486 F.3d 1184, 1192 n.5 (10th Cir. 2007).

2

That same month, A.W. filed a complaint against Yeasin with the university's Office of Institutional Opportunity and Access (IOA), alleging that Yeasin had sexually harassed her. Jennifer Brooks, an IOA investigator, interviewed A.W. about her complaint. *Yeasin*, 360 P.3d at 424. Another IOA investigator, Steve Steinhilber, "interviewed Yeasin regarding the complaint" and "advised Yeasin of his rights and responsibilities during the investigation." *Id.* at 425. Then, "[a]fter considering the Johnson County District Court's final protection from abuse order," the IOA decided to issue Yeasin a no-contact order. *Id.*

The no-contact order informed Yeasin that the university had "received information concerning an allegation that [he] may have violated the University's Sexual Harassment Policy in interactions with University of Kansas student [A.W.]." Appellant's App. at 49. The letter also put Yeasin on notice that he was "prohibited from initiating, or contributing through third-parties, to any physical, verbal, electronic, or written communication with [A.W.], her family, her friends or her associates." *Id.*

After Yeasin received the no-contact order, he tweeted the following messages on August 15, August 23, and September 5:

- Oh right, negative boob job. I remember her. (August 15, 2013);[2]

---

[2] Yeasin would later admit that he and his friends referred to A.W. as "negative double boob job" or "negative boob job" because of A.W.'s genetic condition and subsequent reconstructive surgery. Appellant's App. at 53.

- If I could say one thing to you it would probably be "Go fuck yourself you piece of shit." #butseriouslygofuckyourself #crazyassex (August 23, 2013); and
- Lol, she goes up to my friends and hugs them and then unfriends them on Facebook. #psycho #lolwhat (September 5, 2013).

*Id.* at 51; Appellee's Suppl. App. at 11–13.

Shortly thereafter, A.W.'s friend showed her Yeasin's tweets. A.W. couldn't see the tweets first-hand because Yeasin had removed her from his approved followers when they stopped dating. A.W. then complained to Brooks that Yeasin had tweeted about her despite the no-contact order. On September 6, 2013, Brooks e-mailed Yeasin the following warning:

> While your August 23rd tweet does not specifically state the name of your ex-girlfriend, this communication is in violation of the No Contact Order. I am writing to you to clarify that any reference made on social media regarding [A.W.], even if the communication is not sent to her or [does not] state her name specifically, it is a violation of the No Contact Order.

Appellant's App. at 51. The e-mail further stated, "Going forward, if you make any reference regarding [A.W.], directly or indirectly, on any type of social media or other communication outlet, you will be immediately referred to the Student Conduct Officer for possible sanctions which may result in expulsion from the University." *Id.*

Yeasin then tweeted the following messages:

- #lol you're so obsessed with me you gotta creep on me using your friends accounts #crazybitch (September 7, 2013);
- 30 Reasons to Love Natural Breasts totalfratmove.com/30-reasons-to-… via @totalfratmove #doublenegativeboobjob (September 13, 2013).

4

*Id.* at 54; Appellee's Suppl. App. at 14–16 (alteration in original).

Concerned Yeasin's behavior was escalating, IOA Executive Director Jane McQueeney conducted a follow-up interview with Yeasin on September 17. *Yeasin*, 360 P.3d at 425. She reiterated to him that the no-contact policy applied to his indirect tweets. *Id.* at 425. Shortly thereafter, Yeasin posted the following tweet:

- "At least I'm proportionate." #NDB #boobs @MorganLCox (October 23, 2013).

Appellee Suppl. App. at 16.

All told, Yeasin posted fourteen tweets referring to A.W. without specifically naming her; of these, three were posted after the IOA e-mailed Yeasin and told him to stop.

On October 7, 2013, the IOA issued an investigative report concluding that Yeasin had sexually harassed A.W. in violation of university policy by physically restraining her during the June 28, 2013 incident and by posting the fourteen tweets. The report concluded that "'while some of the conduct in this case occurred off campus this past summer,' the preponderance of the evidence nevertheless showed that Yeasin's conduct had affected the on-campus environment for [A.W.], thus violating the University's sexual harassment policy." *Yeasin*, 360 P.3d at 426 (quoting the IOA's report). The IOA also determined that Yeasin had violated the no-contact order "by continually 'harassing' [A.W.] on social media." *Id.* (quoting the IOA's report).

5

Later that month, Nicholas Kehrwald, the university's director of student conduct and community standards, received the IOA's report and scheduled a formal hearing for November 4, 2013, to adjudicate A.W.'s complaint against Yeasin. *Id.* Kerhwald notified Yeasin of the hearing and "specified that Yeasin's conduct violated Article 22.A.1 of the Student Code, the University's sexual[-]harassment policy, and the no-contact order."[3] *Id.* Kerhwald outlined the following evidence against Yeasin: that Yeasin had posted demeaning tweets about [A.W.]; that Yeasin had physically restrained [A.W.] and held her against her will for three hours in his car; that he had called her demeaning names; that he had threatened suicide when she tried to break-up with him; and that Yeasin's behavior had on-campus effects. *Id.*

---

[3] At the time of Yeasin's discipline, Article 22, which was titled, "Non-Academic Misconduct," stated the following: "While on University premises or at University sponsored or supervised events, students . . . are subject to disciplinary action . . . ." Appellant's App. at 65. And Article 22.A.1 specifically prohibited students from "maliciously and repeatedly follow[ing] or attempt[ing] to make unwanted contact, including but not limited to physical or electronic contact, with another person." *Id.*

The university's sexual-harassment policy stated that "sexual harassment is a form of illegal discrimination in violation of . . . Title IX . . . ." *Id.* at 52. The policy defined sexual harassment to include:

> conduct, including physical contact, advances, and comments in person, through an intermediary, and/or via phone, text message, email, social media, or other electronic medium, that is unwelcome; based on sex or gender stereotypes; and is so severe, pervasive and objectively offensive that it has the purpose or effect of substantially interfering with a person's academic performance.

*Id.* at 53.

On November 4, 2013, the IOA held the formal hearing. A university student, a university staff member, Kerhwald, and Jamie Kratky[4] constituted the hearing panel. The panel reviewed the written documents in the case and then heard from A.W., Yeasin, IOA Executive Director Jane McQueeny, and IOA investigators Steinhilber and Brooks. *Yeasin*, 360 P.3d at 426. Following the hearing, the panel prepared a recommendation and submitted it to Dr. Durham so she could make her final decision regarding whether and how to sanction Yeasin's conduct. In their recommendation, the panel explained that "there was no information presented at any time to dispute the actions set forth in [A.W.'s] complaint or to demonstrate Yeasin did not violate[] Article 22, A and the University's Sexual Harassment policy." Appellee's Suppl. App. at 20. Moreover, they observed, "Yeasin admitted that some tweets that appeared to indirectly target [A.W.] were, in fact, direct references to [A.W.]." *Id.*

Two days after receiving the panel's recommendation, Dr. Durham informed Yeasin of her decision by letter. In the letter, Dr. Durham explained that she reviewed the student code, the complaint brought by A.W., the evidence presented at the hearing, and the hearing panel's recommendation before making her decision. She informed him that "[b]ased on a preponderance of [i]nformation, the hearing panel [found him] in violation of **Article 22. Section A. 1** and the University's Sexual

---

[4] Kratky was only identified in the record as the hearing panel chair.

Harassment Policy" and she outlined the language of both policies. Appellant's App. at 52 (emphasis in original); *see supra* n.3.

Dr. Durham said her decision was based on several facts supported by the preponderance of the evidence, such as the Johnson County protection order and A.W.'s hearing statement that "her grades had slipped significantly during the summer because of the emotional toll her interactions with Mr. Yeasin had taken on her." Appellant's App. at 54. Dr. Durham further relied on A.W.'s statement to the hearing panel that her relationship with Yeasin had "affected her day-to-day on-campus activities, since she [couldn't] enter public campus places without receiving glares and remarks from Yeasin's friends telling her she needs to leave and that her presence is unwanted." Appellee's Suppl. App. at 19. She indicated that Yeasin admitted during the formal hearing that when he was tweeting about "negative double boob job" or "negative boob job", he was referring to A.W. Appellant's App. at 53.

On these bases, Dr. Durham found that Yeasin's June 28, 2013 conduct and his tweets were "so severe, pervasive and objectively offensive that it interfered with [A.W.]'s academic performance and equal opportunity to participate in or benefit from University programs or activities." *Id.* at 54. She found that his tweets violated the sexual-harassment policy because they were "unwelcome comments about [A.W.]'s body." *Id.* And she found that his conduct "threatened the physical health, safety and welfare of [A.W.], making the conduct a violation of **Article 22, A. 1** of the *Code*." *Id.* (emphasis in original).

8

As a result of his conduct, Dr. Durham decided to expel Yeasin from the university and ban him from campus.

### B. Court Proceedings

Yeasin contested his expulsion in Kansas state court. *See Yeasin*, 360 P.3d at 427. The court set aside Yeasin's expulsion, reasoning that the hearing panel's findings, adopted by Dr. Durham, "were not supported by substantial evidence." Appellant's App. at 10. The court also determined that "KU and [Dr.] Durham erroneously interpreted the Student Code of Conduct by applying it to off-campus conduct." *Id.*

The university then appealed. It argued that Article 20 of the student code was a jurisdictional statement that modified the scope of Article 22's language to include the ability to punish students for off-campus conduct that violates federal, state, or local law. *Yeasin*, 360 P.3d at 432. Article 20 provides, "The University may not institute disciplinary proceedings unless the alleged violation(s) giving rise to the disciplinary action occurs on University premises or at University sponsored or supervised events, or as otherwise required by federal, state, or local law." Appellant's App. at 64. The university argued that its interpretation of Article 20 was "consistent with the obligations imposed on it under Title IX." *Yeasin*, 360 P.3d at 429.

But the Kansas Court of Appeals concluded that Article 20 wasn't a jurisdictional statement and that its plain language supported disciplinary actions only against students who violate federal, state, or local law on-campus or at school-

9

sponsored activities. *Yeasin*, 360 P.3d at 431–32. Similarly, the court determined that Article 22's plain language didn't give Dr. Durham authority to expel him because his conduct had occurred off campus. *Yeasin*, 360 P.3d at 432. So the court upheld the order requiring Yeasin's re-enrollment. *Id.* at 432.

Yeasin then brought this suit in federal court, claiming that Dr. Durham had violated his First and Fourteenth Amendment rights by expelling him for the content of his online, off-campus speech. Under Federal Rule of Civil Procedure 12(b)(6), Dr. Durham moved to dismiss both of Yeasin's claims on qualified-immunity grounds. The district court granted the motion after concluding that Dr. Durham hadn't violated Yeasin's clearly established rights.

## DISCUSSION

"We review de novo a district court's dismissal under Federal Rule of Civil Procedure 12(b)(6). We assume the truth of all well-pleaded facts in the complaint, and draw all reasonable inferences therefrom in the light most favorable to the plaintiffs." *Leverington v. City of Colo. Springs*, 643 F.3d 719, 723 (10th Cir. 2011) (quoting *Dias v. City and Cty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009)). In First Amendment cases, we independently examine "the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression." *Id.* at 723 (quoting *Thomas v. City of Blanchard*, 548 F.3d 1317, 1322 (10th Cir. 2008)).

"To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its

10

face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A plaintiff states a facially plausible claim by pleading "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. But a pleading based on only "labels and conclusions" or "formulaic recitation[s]" of a claim for relief's elements is insufficient. *Twombly*, 550 U.S. at 555.

In this case, Dr. Durham predicated her motion to dismiss on her claim of qualified immunity. Qualified immunity protects government officials from liability for civil damages if their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly,* 137 S. Ct. 548, 551 (2017) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015)); *accord A.M. v. Holmes*, 830 F.3d 1123, 1134 (10th Cir. 2016). Qualified immunity "protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Mullenix*, 136 S. Ct. at 308 (quoting *Malley v Briggs*, 475 U.S. 335, 341 (1986)).

To overcome a government official's qualified-immunity defense, a plaintiff must "demonstrate '(1) that the official violated a statutory or constitutional right, *and* (2) that the right was 'clearly established.'" *Holmes*, 830 F.3d at 1134 (quoting *Quinn v. Young*, 780 F.3d 998, 1004 (10th Cir. 2015)) (emphasis in original). We can analyze either prong of the qualified immunity test first and can resolve the case solely on the clearly established prong. *See Panagoulakos v. Yazzie*, 741 F.3d 1126, 1129 (10th Cir. 2013).

A clearly-established right exists if "existing precedent . . . place[s] the statutory or constitutional question beyond debate." *Mullenix*, 136 S. Ct. at 308 (quoting *Ashcroft v. al-Kidd,* 563 U.S. 731, 741 (2011)). "The dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'" *Mullenix*, 136 S. Ct. at 308 (quoting *al-Kidd*, 563 U.S. at 742). A plaintiff needn't supply a case directly on point from our circuit or the Supreme Court but must do more than cite case law announcing a legal rule "at a high level of generality." *White*, 137 S. Ct. at 552 (quoting *Al-Kidd*, 563 U.S. at 742). The relevant case law "must be 'particularized' to the facts of the case" currently before the court. *Id.* at 552 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

For the reasons set forth below, we conclude that Yeasin has failed to show that Dr. Durham violated his clearly established rights under either the First Amendment or the Fourteenth Amendment. As a result, we needn't resolve whether Yeasin could meet the first prong of the qualified-immunity analysis for either issue.

*A. First Amendment*

The First Amendment states, "Congress shall make no law . . . abridging the freedom of speech[] . . . ." U.S. Const. amend. I. But what happens when one student's off-campus speech interferes with another student's education on a university campus?

Yeasin's case presents interesting questions regarding the tension between some students' free-speech rights and other students' Title IX rights to receive an education absent sex discrimination in the form of sexual harassment. Department of

12

Education Office for Civil Rights Dear Colleague Letter on Sexual Violence (OCR Sexual Violence DCL), April 4, 2011, at 1, https://www2.ed.gov/print/about/offices/list/ocr/letters/colleague-201104.html ("Sexual harassment of students, which includes acts of sexual violence, is a form of sex discrimination prohibited by Title IX.").[5] But even if Yeasin could show that Dr. Durham violated his First Amendment rights, we conclude that he has failed to show a violation of clearly established law. We don't decide whether Yeasin had a First Amendment right to post his tweets without being disciplined by the university.

"[C]olleges and universities are not enclaves immune from the sweep of the First Amendment." *Healy v. James*, 408 U.S. 169, 180 (1972). But both the Supreme Court and our circuit permit schools to circumscribe students' free-speech rights in certain contexts.[6] Broad legal principles in student free-speech cases provide some guidance on issues Yeasin raises, but they cannot suffice as clearly established law.

---

[5] This guidance is no longer in effect. *See* OCR DCL, Sept. 22, 2017, at 1, www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf ("The purpose of this letter is to inform you that the Department of Education is withdrawing the statements of policy and guidance reflected in the . . . Dear Colleague Letter on Sexual Violence, issued by the Office for Civil Rights at the U.S. Department of Education, dated April 4, 2011.").

[6] *See, e.g., Morse v. Frederick*, 551 U.S. 393, 397, 408 (2007) (allowing school to discipline a student for flying a banner reading "BONG HiTs 4 JESUS" at an off-campus, school-approved activity because the banner could reasonably be viewed as promoting drug use); *see also Axson-Flynn v. Johnson*, 356 F.3d 1277, 1285 (10th Cir. 2004) (holding that the *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260, 273 (1988) framework for free-speech analysis is applicable in a university setting for speech that occurs in a classroom as part of a class curriculum).

13

*Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 513 (1969), announced that secondary-school students retain free-speech rights but that schools can still prohibit actions that "would materially and substantially disrupt the work and discipline of the school." The Supreme Court has announced three additional exceptions to First Amendment doctrine in public schools. Secondary public schools may restrict student speech even absent a forecast of disruption in cases involving lewd, vulgar, or indecent speech, *Bethel School District No. 403 v. Fraser*, 478 U.S. 675, 685 (1986), school-sponsored speech, *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260, 273 (1988), and speech advocating illegal drug use, *Morse v. Frederick*, 551 U.S. 393, 408 (2007). But Yeasin contends that *Tinker* and its progeny are inapplicable in the university setting.

Yeasin argues that *Papish v. Board of Curators of the University of Missouri*, 410 U.S. 667, 670 (1973) (per curiam), *Widmar v. Vincent*, 454 U.S. 263, 268–69 (1981), and *Healy*, 408 U.S. at 180, clearly establish the "underlying principle[]" that universities may not restrict university-student speech in the same way secondary public school officials may restrict secondary-school student speech. Appellant's Opening Br. at 11–12. Yeasin also argues that *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015), clearly establishes that content-based restrictions "are disfavored and presumptively invalid under the law." Appellant's Opening Br. at 12. Taken together, Yeasin argues, these cases clearly establish his right to tweet about A.W. without the university being able to place restrictions on, or discipline him for, the contents of his tweets.

14

But none of the above cases present circumstances similar to his own. *Papish*, *Healy*, and *Widmar* don't concern university-student conduct that interferes with the rights of other students or risks disrupting campus order.

In *Papish*, a university expelled a graduate student for distributing a newspaper on campus allegedly "containing forms of indecent speech" in violation of university by-laws. 410 U.S. at 667. The Supreme Court explained that because the newspaper's content didn't interfere "with the rights of others" or disrupt "the University's functions," the sole question "was whether a state university could proscribe [the newspaper's] form of expression." *Id.* at 670 n.6.

*Healy* concerned a state college's refusal to officially recognize a student group known as Students for a Democratic Society because of its potential affiliation with a national organization known for campus disruption. 408 U.S. at 170–71. The *Healy* Court determined that because the college's refusal to recognize the student group stemmed from undifferentiated fear or apprehension that the particular individuals forming the group "posed a substantial threat of material disruption," the college's action was unconstitutional under *Tinker*. *Healy*, 408 U.S. at 189–91; *see also Tinker*, 393 U.S. at 508.

And in *Widmar*, a university disallowed a registered religious student group from meeting in university buildings. 454 U.S. at 265. *Widmar* decided that "having created a forum generally open to student groups," it was unconstitutional for a university to "enforce a content-based exclusion of religious speech." *Id.* at 277. *Widmar* doesn't say whether the religious student group had somehow threatened to

15

disrupt campus order or interfere with other students' educations. But after reciting the strict-scrutiny test for content-based restrictions, the Supreme Court quoted *Healy's* proposition that "[w]hile a college has a legitimate interest in preventing disruption on the campus, which . . . may justify [a prior] restraint, a heavy burden rests on the college to demonstrate the appropriateness of that action." *See Widmar*, 454 U.S. at 270 n.7 (ellipsis in original) (internal quotation marks omitted) (quoting *Healy*, 408 U.S. at 184). This language suggests that the Supreme Court believes that the material-and-substantial-disruption test applies in the university setting.

*Papish*, *Healy*, *Widmar*, and *Reed* provide broad principles that are too general to have clearly established Yeasin's rights to tweet about A.W. free from university discipline. Yeasin's conduct differs from that of the students in his cited cases—in those cases no student had been charged with a crime against another student and followed that up with sexually harassing comments affecting her ability to feel safe while attending classes. Dr. Durham had a reasonable belief based on the June 28, 2013 incident and on Yeasin's tweets that his continued enrollment at the university threatened to disrupt A.W.'s education and interfere with her rights.

At the intersection of university speech and social media, First Amendment doctrine is unsettled. *Compare Keefe v. Adams,* 840 F.3d 523, 525–26 (8th Cir. 2016) (concluding that college's removal of a student from school based on off-campus statements on his social media page didn't violate his First Amendment free-speech rights), *with J.S. v. Blue Mountain. Sch. Dist.,* 650 F.3d 915, 920 (3d Cir. 2011) (holding that a school district violated the First Amendment rights of a plaintiff when

16

it suspended her for creating a private social media profile mocking the school principal and containing adult and explicit content). It is thus unsurprising that Yeasin's broad propositions of law don't meet the standard required to show clearly established law under *White* and *Mullenix*.

In conclusion, Yeasin can't establish that Dr. Durham violated clearly established law when she expelled him, in part, for his online, off-campus tweets.

### B. Substantive Due Process

Yeasin's substantive-due-process claim is similarly flawed. The Fourteenth Amendment's Due Process Clause protects interests in life, liberty, and property from arbitrary government action. *Butler v. Rio Rancho Pub. Sch. Bd. of Educ.*, 341 F.3d 1197, 1200 (10th Cir. 2003). We have held that university students have a property interest in their continued education. *Harris v. Blake*, 798 F.2d 419, 424 (10th Cir. 1986). But to establish that a deprivation of a property interest violates substantive due process, a student must prove that the university's decision to expel her was arbitrary, lacked a rational basis, or shocks the conscience. *Butler*, 341 F.3d at 1200–01. We don't resolve whether Dr. Durham's decision to expel Yeasin violated his right to substantive due process but decide only that she violated no clearly established law in doing so.

Yeasin points to *Michigan v. Ewing*, 474 U.S. 214, 225 (1985), *Harris*, 798 F.2d at 424–25, and *Gossett v. Oklahoma ex rel. Board of Regents for Langston University*, 245 F.3d 1172, 1181–82 (10th Cir. 2001), as sufficient to notify Dr. Durham that she would violate his substantive-due-process rights if she expelled him

17

for off-campus, online conduct. Appellant's Opening Br. at 25–26. But as Yeasin concedes, these cases "are not exactly on point." Appellant's Opening Br. at 26.

In *Ewing*, a student pursuing a joint degree failed an exam that was necessary to advance in the program. *Ewing*, 474 U.S. at 215–16. The student unsuccessfully petitioned various university bodies for his readmission and a chance to retake the exam. *Id.* at 216–17. When those appeals were unsuccessful, he sued the university, alleging that the university acted arbitrarily and deprived him of substantive due process by dropping him from the joint degree program without allowing him to retake the exam. *Id.* at 217, 223–25. The Supreme Court disagreed and determined that his dismissal from the "program rested on an academic judgment that is not beyond the pale of reasoned academic decision-making when viewed against the background of his entire career" in the program, including his failing exam score. *Id.* at 227–28.

*Harris* involved a university student who was forced to withdraw from a psychology program after his grade-point average fell below the minimum requirement. 798 F.2d at 421. Upon learning that a professor placed a letter in his academic file expressing reservations about his fitness for the psychology program before his withdrawal, he persuaded the dean of his college to have the letter removed from his file. *Id.* at 421–22. Meanwhile, he challenged the low grades he received and the placement of the letter into his file before an academic appeals board. *Id.* at 422. The appeals board upheld his grades and declined to rule on the letter issue since the dean had it removed from his file. *Id.* at 422. Subsequently, he

18

sued the university and alleged he was denied substantive due process because of the letter and his low grades. *Id.* at 422, 424–25. Our court determined that *Ewing* was dispositive and that the student hadn't made out a substantive due process claim because the essence of the student's claim was that the university "misjudged his fitness to remain a student." *Id.* at 424–25.

And in *Gossett*, a male nursing student alleged he was denied substantive due process when he was involuntarily withdrawn from his nursing program after receiving a 'D' grade in a class. 245 F.3d at 1175–76. Specifically, he argued that nursing students who were men were "not given the same help, counseling, and opportunities to improve [their] performance[s]" as the school gave nursing students who were women. *Id.* at 1176. The district court granted the university summary judgment. *Id.* at 1175. But on appeal, our court remanded the student's substantive due process claim because he presented sufficient evidence to create a fact issue as to whether he was dismissed "based on an exercise of professional judgment as to his academic ability" or "impermissible gender discrimination." *Id.* at 1182.

In each of the above cases, the underlying principle is that in order to have a substantive-due-process claim for being expelled "based on an academic decision," a university student "must show that the decision was the product of arbitrary state action rather than a conscientious, careful and deliberate exercise of professional judgment." *Gossett*, 245 F.3d at 1182. Students can prove this with "evidence that the challenged decision was based on 'nonacademic or constitutionally impermissible reasons,' rather than the product of conscientious and careful deliberation." *Gossett*,

19

245 F.3d at 1182 (quoting *Ewing*, 474 U.S. at 225). We can't apply the *Ewing* principle to Yeasin's case because Dr. Durham's decision was explicitly and purposefully non-academic.[7] *Ewing*, *Harris*, and *Gossett* don't clearly establish that Dr. Durham expelling Yeasin, in part, for off-campus, online tweets that affected another student's ability to get an education, was arbitrary, lacked a rational basis, or shocks the conscience.

In sum, Dr. Durham didn't violate clearly established law when she expelled Yeasin for non-academic misconduct related to the June 29, 2013 incident and his tweets.

## CONCLUSION

For the reasons stated, we AFFIRM the district court's grant of Dr. Durham's motion to dismiss on the basis of qualified immunity.

Entered for the Court

Gregory A. Phillips
Circuit Judge

---

[7] *Compare Bd. of Curators of Univ. of Missouri v. Horowitz*, 435 U.S. 78, 88–90 (1978) (holding that academic dismissals from universities require only minimal due-process protections because courts are reluctant to second-guess an educator's expert judgment on educational matters), *with Goss v. Lopez*, 419 U.S. 565, 581–84 (1975) (holding that dismissal from a school based on non-academic, disciplinary reasons requires notice and a hearing commensurate with the circumstances and severity of the situation). Yeasin doesn't contend that he received an insufficient amount of process.