**United States Court of Appeals**
**For the Eighth Circuit**

No. 14-2988

Craig Keefe

*Plaintiff - Appellant*

v.

Beth Adams; Connie Frisch; Kelly McCalla

*Defendants - Appellees*

------------------------------

Foundation for Individual Rights in Education; Alliance Defending Freedom; Student Press Law Center; Electronic Frontier Foundation; American Booksellers Foundation for Free Expression; National Coalition Against Censorship; American Civil Liberties Union of Minnesota

*Amici on Behalf of Appellant*

Appeal from United States District Court for the District of Minnesota - Minneapolis

Submitted: June 10, 2015
Filed: October 26, 2016

Before LOKEN, SHEPHERD,[1] and KELLY, Circuit Judges.

---

LOKEN, Circuit Judge.

After Central Lakes College (CLC) received student complaints about posts on Craig Keefe's Facebook page, he was removed from the Associate Degree Nursing Program for behavior unbecoming of the profession and transgression of professional boundaries. Keefe filed suit against several CLC administrators, alleging violations of his First Amendment and due process rights. After some defendants were dismissed, the district court[2] granted the remaining defendants summary judgment. Keefe v. Adams, Civ. No. 13-326, Order (D. Minn. Aug. 26, 2014). Keefe appeals. Reviewing the grant of summary judgment *de novo*, we affirm. See Richmond v. Fowlkes, 228 F.3d 854, 857 (8th Cir. 2000) (standard of review).

## I. Background

A. The Events Leading to Removal. Keefe completed the practical nursing program at CLC and became a licensed practical nurse in June 2011. He enrolled in the Associate Degree Nursing Program in the fall of 2011, seeking to become a registered nurse. He was dismissed at the end of that semester for failing to maintain the required grade levels in all nursing courses. He reapplied, was admitted to the Program, and again began classes in the fall of 2012.

---

[1]Judge Kermit E. Bye was initially assigned to this panel when the case was submitted but has resigned from active participation. Judge Bobby E. Shepherd was randomly selected to replace Judge Bye on the panel.

[2]The Honorable Joan N. Ericksen, United States District Judge for the District of Minnesota.

In late November, a student complained to Keefe's instructor, Kim Scott, about several posts Keefe had made on his public Facebook page. She provided Scott printouts of five posts she felt were threatening and related to the classroom. A few days later, a second student approached Scott at the start of a clinical class in which she was enrolled with Keefe. She told Scott that Keefe made statements on Facebook that "made her feel extremely uncomfortable and nervous," and that "she didn't feel she could function in the same physical space with Craig at the clinical site." Concerned about patient care and safety in the clinic, Scott separated Keefe and the student during the shift. The student forwarded the posts to Scott later that day.

After receiving the two complaints, Scott forwarded the posts to her supervisor, Connie Frisch, CLC's Director of Nursing. Frisch read the posts and verified they came from Keefe and were accessible to anyone on the internet. Frisch then contacted the Vice President of Academic Affairs, Kelly McCalla, who told her to meet with Keefe. Frisch contacted Keefe and set up a meeting, without explaining its purpose. Keefe sent Frisch an email asking for more detail about the meeting. Frisch responded that she would prefer to review the topic in person rather than via phone or email, advising Keefe he did not need to prepare for the meeting and noting that "the topic of professional boundary is central to the role of the nurse and I am sure that you appreciate the delicacy of the topic."

Frisch then received an email from Kim Scott relaying a student's concern that Keefe had told someone there would be "hell to pay for whoever complained about me." Frisch called Keefe and moved the meeting up one day, so that he would not be in his next clinical class with the concerned student. Keefe again asked what the meeting was about. Frisch again said she would prefer to discuss it in person but that due process would be followed.

On the agreed day, Keefe met with Frisch and Beth Adams, CLC's Dean of Students. McCalla did not attend because he would be responsible for reviewing any

academic appeal. Frisch began the meeting by reviewing the steps of the Due Process Policy from the Student Handbook. She told Keefe that his Facebook posts raised concerns about his professionalism and boundary issues. She did not give him copies of the posts, but she read aloud portions of the posts that she considered most significant. We will reproduce only the posts that Frisch and Adams testified gave them particular concern. A more extensive recital of the offensive posts that Scott forwarded to Frisch can be found at pages 5-6 of the district court's Order:

> Glad group projects are group projects. I give her a big fat F for changing the group power point at eleven last night and resubmitting. Not enough whiskey to control that anger.
>
> Doesnt anyone know or have heard of mechanical pencils. Im going to take this electric pencil sharpener in this class and give someone a hemopneumothorax[3] with it before to long. I might need some anger management.
>
> LMAO [a classmate], you keep reporting my post and get me banded. I don't really care. If thats the smartest thing you can come up with than I completely understand why your going to fail out of the RN program you stupid bitch....And quite creeping on my page. Your not a friend of mine for a reason. If you don't like what I have to say than don't come and ask me, thats basically what creeping is isn't it. Stay off my page...

Frisch, who testified she was most disturbed by the statement about giving someone a hemopneumothorax, then gave Keefe an opportunity to respond. He told her there were a lot of jokes on his page, his page had been hacked, and he did not know it was public. Frisch testified that Keefe was not receptive to her concern that the posts were unprofessional. Based on Keefe's "lack of remorse, lack of concern,

---

[3]Keefe testified that a hemopneumothorax is a "trauma" where the lung is punctured and air and blood flood the lung cavity; it is not a medical procedure.

not recognizing, not saying he wanted to change," Frisch decided to remove him from the Associate Degree Program:

> Clearly there was a lot of confusion about the professionalism . . . I didn't believe I could teach him. He was not responsive to what I said. You know, nursing programs have an obligation to graduate students who are not just able to pass the classes, but to be safe and to have all of the soft skills, including professionalism . . . . I could not see that he had it. In fact he convinced me that I wasn't going to be able to teach him that.

At the end of the meeting, Frisch told Keefe he could finish the semester and his credits would transfer as electives to a different course of study within CLC. She also advised Keefe he could appeal the decision to Vice President McCalla. Beth Adams testified that Keefe appeared not to understand the seriousness of the problem; he was defensive and did not seem to feel responsible or remorseful. She was concerned about the "whiskey for anger management" post because Keefe became argumentative during the discussion.

Keefe testified he asked Frisch which posts she was referring to, and she mentioned the comment about using whiskey for anger management, the swearing, and calling a fellow student a "stupid bitch." When she gave him an opportunity to respond, Keefe told her that his Facebook page had been hacked, but he confirmed in his deposition that he wrote each of the posts in question. He also told Frisch that many of his comments were jokes. She responded that his comments were quite disturbing and that she felt he had anger issues. Keefe testified that, when he mentioned his First Amendment rights, Frisch said that she understood his rights but this was about professionalism.

<u>B. The Relevant Nursing Program Standards.</u> As part of enrolling in the Associate Degree Program, Keefe acknowledged receipt, review, and understanding

of the Nursing Program Student Handbook. The handbook states that "all current and future students are expected to adhere to the policies and procedures of this student handbook." Following the meeting, Frisch wrote a letter to Keefe, stating: "As we discussed, the decision has been made to remove you from the Associate Degree Nursing Program at CLC as a consequence of behavior unbecoming of the profession and transgression of professional boundaries" based on the contents of his Facebook page. The letter reviewed the appeal process and stated he was being removed pursuant to the following section of the Nursing Program's handbook:

> **Student Removal from Nursing Program**
> Integral to the profession of nursing is a concern for the welfare of the sick, injured, and vulnerable and for social justice; therefore students enrolled in the Associate Degree (AD) Nursing Program and Central Lakes College (CLC) accept the moral and ethical responsibilities that have been credited to the profession of nursing and are obligated to uphold and adhere to the professional Code of Ethics. The *American Nurses Association (2001) Code for Nurses with Interpretive Statements* outlines the goals, values, and ethical principles that direct the profession of nursing and is the standard by which ethical conduct is guided and evaluated by the profession. The AD Nursing Program at Central Lakes College has an obligation to graduate students who will provide safe, competent nursing care and uphold the moral and ethical principles of the profession of nursing. Therefore, students who fail to meet the moral, ethical, or professional behavioral standards of the nursing program are not eligible to progress in the nursing program. Students who do not meet academic or clinical standards and/or who violate the student Code of Conduct as described in the Central Lakes College catalog and the AD Nursing Student Handbook are also ineligible to progress in the AD Nursing Program. Behaviors that violate academic, moral, and ethical standards include, but are not limited to, behaviors described in the College Catalog Student Code of Conduct as well as:
>
> . . .
>
> - transgression of professional boundaries;

- breaching of confidentiality/HIPAA (including any type of social media breach);
- behavior unbecoming of the Nursing Profession.

> Students who fail to adhere to the CLC Student Code of Conduct and the moral and ethical standards outlined in the handbook are ineligible to progress in the Nursing Program.

The Nurses Association Code of Ethics, which the Handbook states students are "obligated to uphold and adhere to," emphasizes professionalism and personal and professional boundaries:

> **1.5 Relationships with colleagues and others** -- The principle of respect for persons extends to all individuals with whom the nurse interacts. The nurse maintains compassionate and caring relationships with colleagues and others with a commitment to the fair treatment of individuals, to integrity-preserving compromise, and to resolving conflict. Nurses function in many roles, including direct care provider, administrator, educator, researcher, and consultant. In each of these roles, the nurse treats colleagues, employees, assistants, and students with respect and compassion. This standard of conduct precludes any and all forms of prejudicial actions, any form of harassment or threatening behavior, or disregard for the effect of one's actions on others.
>
> **2.4 Professional Boundaries** -- When acting within one's role as a professional, the nurse recognizes and maintains boundaries that establish appropriate limits to relationships. . . . In this way, nurse-patient and nurse-colleague relationships differ from those that are purely personal and unstructured, such as friendship. . . . In all encounters, nurses are responsible for retaining their professional boundaries.
>
> **5.3 Wholeness of character** -- Nurses have both personal and professional identities that are neither entirely separate, nor entirely

> merged, but are integrated. In the process of becoming a professional, the nurse embraces the values of the profession, integrating them with personal values.[4]

C. Keefe's Administrative Appeal. Keefe spoke with Vice President McCalla the next day to discuss the appeal process. McCalla reviewed the substance of the posts with Keefe and referred him to a student advocate, who helped write the appeal. Before filing the appeal, Keefe sent Frisch a lengthy email identifying procedures in CLC's Due Process Policy he had not been provided. Frisch forwarded the email to McCalla, who then emailed Keefe that his appeal had been received and warned Keefe that he should not contact the nursing faculty, the Dean of Nursing, or his former nursing classmates. Keefe testified that he did not attend further classes or take the exams because he believed McCalla meant that he was to have no contact with anyone in the Nursing Program. As a result, he failed his classes.

On December 11, 2012, Keefe submitted a lengthy "Due Process Appeal" letter, stating he had removed offensive comments from his Facebook page and "removed myself from the social media network." Keefe petitioned that he be allowed to finish the Associate Degree Nursing Program because "I don't believe the punishment fits the crime." The letter concluded:

> I took a huge risk participating in the social media network as a nursing student and nurse, both professionally and unethically and have learned a valuable lesson and will not participate in such activity in the future to risk my professional image as well as CLC's professional image. I would like to Thank You for this opportunity to express my sincere

[4]American Nurses Association, Code of Ethics for Nurses with Interpretive Statements 4-6, 10 (2001), https://courseweb.pitt.edu/bbcswebdav/institution/Pitt%20Online/Nursing/NUR%202008/Module%2001/Readings/ANA_ethics.pdf.

> apology for my unethical and unprofessional behavior and giving me the opportunity to possibly finish . . . my education.

McCalla left a phone message in early January informing Keefe that his appeal was being denied. Keefe emailed McCalla requesting a contested case hearing. McCalla responded that a contested case hearing was only available for a student disciplinary action, whereas Keefe had been removed for an academic program violation. This lawsuit followed.

## II. First Amendment Issues

Keefe argues that defendants violated his First Amendment right to free speech by removing him from the Nursing Program at a public college "for comments on the internet which were done outside of class and unrelated to any course assignments or requirements, and did not violate any specific rules." Keefe's Reply Brief frames this contention categorically -- a college student may not be punished for off-campus speech, he contends, unless it is speech that is unprotected by the First Amendment, such as obscenity. To our knowledge, no court has adopted this extreme position, and we decline to do so.

**A.** The first question raised by Keefe's claim is significant -- whether the First Amendment precludes a public university from adopting, as part of its curriculum for obtaining a graduate degree in a health care profession, the Code of Ethics adopted by a nationally recognized association of practicing professionals. Without question, the Supreme Court does not favor creating new First Amendment exceptions that could be used to restrict protected speech. See, e.g., United States v. Stevens, 559 U.S. 460, 468 (2010). But these decisions involved a question not at issue here -- whether to recognize new categories of *unprotected* speech. To paraphrase Chief Justice Roberts, writing for the Court in Williams-Yulee v. Florida Bar, 135 S. Ct. 1656, 1657 (2015), "nobody argues that [Keefe's Facebook postings are] a category

of unprotected speech. . . . [T]he First Amendment fully applies to [that] speech. The question is instead whether that Amendment permits the particular regulation of speech at issue here."

Many courts have upheld enforcement of academic requirements of professionalism and fitness, particularly for a program training licensed medical professionals. See Oyama v. Univ. of Hawaii, 813 F.3d 850, 866-68 (9th Cir. 2015); Ward v. Polite, 667 F.3d 727, 733-34 (6th Cir. 2012); Keeton v. Anderson-Wiley, 664 F.3d 865, 875-76 (11th Cir. 2011); Hosty v. Carter, 412 F.3d 731, 734-35 (7th Cir. 2005), cert. denied, 546 U.S. 1169 (2006); Axson-Flynn v. Johnson, 356 F.3d 1277, 1286-90 (10th Cir. 2004); Brown v. Li, 308 F.3d 939, 947-49 (9th Cir. 2002) (opinion of Graber, J.), cert. denied, 538 U.S. 908 (2003). Fitness to practice as a health care professional goes beyond satisfactory performance of academic course work. As the Supreme Court said in Board of Curators of Univ. of Mo. v. Horowitz, 435 U.S. 78, 91 n.6 (1978), "Personal hygiene and timeliness may be as important factors in a school's determination of whether a student will make a good medical doctor as the student's ability to take a case history or diagnose an illness."

Given the strong state interest in regulating health professions, teaching and enforcing viewpoint-neutral professional codes of ethics are a legitimate part of a professional school's curriculum that do not, at least on their face, run afoul of the First Amendment. See Al-Dabagh v. Case W. Reserve Univ., 777 F.3d 355, 359-60 (6th Cir.), cert. denied, 135 S. Ct. 2817 (2015); Ward, 667 F.3d at 732; Keeton, 664 F.3d at 876.[5] Because professional codes of ethics are broadly worded, they can be cited to restrict protected speech. For example, a university may violate the First

---

[5]Courts have long recognized that the state has a particular interest in regulating health care to protect the public health. States may insist that practitioners demonstrate that they possess not only the requisite skills and knowledge, but also the requisite character. See Hawker v. N.Y., 170 U.S. 189, 192 (1898); State ex rel Powell v. State Med. Examining Bd., 20 N.W. 238, 240 (Minn. 1884).

Amendment if it invokes a curriculum-based code of ethics as a pretext to punish a student's religious views and speech. See Ward, 667 F.3d at 735; Axson-Flynn, 356 F.3d at 1292-93. But that is an as-applied inquiry. Here, Keefe made no allegation, and presented no evidence, that defendants' reliance on the Nurses Association Code of Ethics was a pretext for viewpoint, or any other kind of discrimination.

**B.** If compliance with professional ethical standards is a permissible academic requirement, then determinations of non-compliance will almost always be based at least in part on a student's speech. See, e.g., Oyama, 813 F.3d at 870 ("the University could look to what Oyama *said* as an indication of what he would *do* once certified") (emphasis in original). That a graduate student's unprofessional speech leads to academic disadvantage does not "prohibit" that speech, or render it unprotected; the university simply imposes an adverse consequence on the student for exercising his right to speak at the wrong place and time, like the student who receives a failing grade for submitting a paper on the wrong subject.

A serious question raised by Keefe in this case is whether the First Amendment protected his unprofessional speech from academic disadvantage because it was made in on-line, off-campus Facebook postings. On appeal, Keefe framed this contention categorically, arguing that a college student may not be punished for off-campus speech unless it is speech that is unprotected by the First Amendment, such as obscenity. We reject this categorical contention. A student may demonstrate an unacceptable lack of professionalism off campus, as well as in the classroom, and by speech as well as conduct. See Yoder v. Univ. of Louisville, 526 F. App'x 537, 545-46 (6th Cir.), cert. denied, 134 S. Ct. 790 (2013); Tatro v. Univ. of Minn., 816 N.W.2d 509, 521 (Minn. 2012). Therefore, college administrators and educators in a professional school have discretion to require compliance with recognized standards of the profession, both on and off campus, "so long as their actions are reasonably related to legitimate pedagogical concerns." Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 273 (1988).

As the issue in Hazelwood was censorship of a school-sponsored campus newspaper, the Court's reference to "legitimate pedagogical concerns" was made in the context of school-sponsored speech. But the concept has broader relevance to student speech. The Hazelwood dissenters noted that an "educator may, under Tinker,[6] constitutionally 'censor' poor grammar, writing, or research because to reward such expression would 'materially disrupt' the [student] newspaper's curricular purpose." 484 U.S. at 284 (Brennan, J., dissenting). Likewise, because compliance with the Nurses Association Code of Ethics is a legitimate part of the Associate Degree Nursing Program's curriculum, speech reflecting non-compliance with that Code that is related to academic activities "materially disrupts" the Program's "legitimate pedagogical concerns." See Keeton, 664 F.3d at 876 ("under the Hazelwood framework, we find that ASU has a legitimate pedagogical concern in teaching its students to comply with the ACA Code of Ethics").

As our sister circuits have recognized, a college or university may have an even stronger interest in the content of its curriculum and imposing academic discipline than did the high school at issue in Hazelwood. See Ward v. Polite, 667 F.3d 727, 733-34 (6th Cir. 2012); Keeton v. Anderson-Wiley, 664 F.3d 865, 875-76 (11th Cir. 2011); Hosty v. Carter, 412 F.3d 731, 734-35 (7th Cir. 2005), cert. denied, 546 U.S. 1169 (2006); Axson-Flynn v. Johnson, 356 F.3d 1277, 1286-90 (10th Cir. 2004); Brown v. Li, 308 F.3d 939, 947-49 (9th Cir. 2002) (opinion of Graber, J.), cert. denied, 538 U.S. 908 (2003). "When a university lays out a program's curriculum or

---

[6]A reference to the landmark school speech case, Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 504 (1969). This court, like other circuits, has held that Tinker permits disciplining public school students for off-campus postings "where it is reasonably foreseeable that the speech will reach the school community and cause a substantial disruption to the educational setting." S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist., 696 F.3d 771, 777 (8th Cir. 2012), citing Kowalski v. Berkeley Cnty. Schools, 652 F.3d 565, 573 (4th Cir. 2011), and Doninger v. Niehoff, 527 F.3d 41, 50 (2d Cir. 2008).

class's requirements for all to see, it is the rare day when a student can exercise a First Amendment veto over them." Ward, 667 F.3d at 734.

**C.** In addition to urging an overbroad categorical standard, Keefe's contention is factually flawed in asserting that his offensive Facebook posts were "unrelated to any course assignments or requirements." The summary judgment record conclusively established that the posts were directed at classmates, involved their conduct in the Nursing Program, and included a physical threat related to their medical studies -- "Im going to . . . give someone a hemopneumothorax." Two victims of Keefe's tirades complained to instructor Kim Scott, one saying she could not function in the same clinical space with Keefe. Keefe's disrespectful and threatening statements toward his colleagues had a direct impact on the students' educational experience. They also had the potential to impact patient care. As Scott testified, "when [students] are in the clinical setting taking care of patients, if we are creating [a] situation where they are not obviously communicating and collaborating, that can result in poor outcomes for the patients."

**D.** Keefe's threats could have prompted a disciplinary proceeding. Instead, CLC's administrators concluded that the posts, combined with Keefe's failure to appreciate the seriousness of the problem when given an opportunity to respond, reflected a lack of professionalism that warranted his removal from the Associate Degree Nursing Program. That decision can of course be questioned, but the First Amendment did not bar educator Frisch from making the determination that Keefe was unable to meet the professional demands of being a nurse. Keefe argues that defendants violated his First Amendment rights by failing to cite specific professional standards that he violated. The district court expressly rejected this contention:

> Part of the program is devoted to instilling in students the standards of the nursing profession. The associate degree nursing program incorporated nationally established nursing standards. Its ability to

> discipline students for "behavior unbecoming of the Nursing Profession" or "transgression of professional boundaries" reflects the ability of the Minnesota Board of Nursing to "deny, revoke, suspend, limit, or condition the license and registration of any person to practice professional, advanced practice registered, or practical nursing" for "[e]ngaging in unprofessional conduct." Greater specificity is not required.

Order at 23 (statute and regulation citations omitted). We agree. Students in the CLC Nursing Program consent in writing to be bound by the national Nursing Code of Ethics, and the Program Handbook states that a violation of moral, ethical, or professional standards may result in dismissal from the program. These standards are necessarily quite general, but they are widely recognized and followed.

"[F]oremost among a school's speech is its selection and implementation of a curriculum -- the lessons students need to understand and the best way to impart those lessons -- and public schools have broad discretion in making these choices." Ward, 667 F.3d at 732. The decision to dismiss Keefe occurred only after Frisch met with Keefe and determined, not only that he had crossed the professional boundaries line, but that he had no understanding of what he did or why it was wrong, and he evidenced no remorse for his actions. The First Amendment did not bar educator Frisch from making the determination that Keefe was unable to meet the professional demands of being a nurse. See Oyama, 813 F.3d at 866-68; Keeton, 664 F.3d at 875. "Considerations of profound importance counsel restrained judicial review of the substance of academic decisions." Regents of Univ. of Mich. v. Ewing, 474 U.S. 214, 225-26 (1985); see Keeton, 664 F.3d at 875-76, and cases cited. Courts should be particularly cautious before interfering with the "degree requirements in the health care field when the conferral of a degree places the school's imprimatur upon the student as qualified to pursue his chosen profession." Doherty v. S. Coll. of Optometry, 862 F.2d 570, 576 (6th Cir. 1988), cert. denied, 493 U.S. 810 (1989).

For these reasons, we affirm the district court's grant of summary judgment to Defendants on Keefe's First Amendment claims.

### III. Due Process Issues

**A.** Keefe argues that Defendants violated his Fourteenth Amendment right to due process when they removed him from the Associate Degree Nursing Program. He first argues that his removal from the Nursing Program was arbitrary and capricious. This is a substantive due process claim seeking federal court review of the *merits* of defendants' removal decision. The claim is without merit.

In two decisions, the Supreme Court has "assumed, without deciding, that federal courts can review an academic decision of a public educational institution under a substantive due process standard." Ewing, 474 U.S. at 222, citing Horowitz, 435 U.S. at 91-92. In Horowitz, the Court agreed with the district court that "no showing of arbitrariness or capriciousness has been made," noting that "[c]ourts are particularly ill-equipped to evaluate academic performance." 435 U.S. at 92. In Ewing, the Court was even more deferential to educators, rejecting the dismissed student's substantive due process claim because "his dismissal from the [university] program rested on an academic judgment that is not beyond the pale of reasoned academic decision-making." 474 U.S. at 227-28. Following the Supreme Court's lead, we have repeatedly assumed without deciding that an academic dismissal may be challenged on substantive due process grounds but upheld the summary rejection of those claims, applying the Supreme Court's deferential standard. See Monroe v. Ark. State Univ., 495 F.3d 591, 594-97 (8th Cir. 2007); Richmond v. Fowlkes, 228 F.3d 854, 859 (8th Cir. 2000); Schuler v. Univ. of Minn., 788 F.2d 510, 515-16 (8th Cir. 1986), cert. denied, 479 U.S. 1056 (1987).

In this case, we doubt there is a cause of action because, though Keefe was removed from the Nursing Program, he was allowed to remain at CLC and transfer

his credits to another academic program. But even if a substantive due process claim is cognizable in these circumstances, there is no violation of substantive due process unless misconduct of government officials that violates a fundamental right is "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience" of federal judges. Cnty. of Sacremento v. Lewis, 523 U.S. 833, 847 n.8 (1998) (quotation omitted).

In our view, it is clear that defendants' decision to remove Keefe from the Nursing Program "rested on an academic judgment that is not beyond the pale of reasoned academic decision-making." Defendants' action in quietly removing Keefe from Central Lakes' Nursing Program for behavior he admitted was "unethical and unprofessional," while allowing him to remain in school, was far from conscience shocking. Cf. Singleton v. Cecil, 176 F.3d 419, 426 n.8 (8th Cir.) (en banc), cert. denied, 528 U.S. 966 (1999). "When judges are asked to review the substance of a genuinely academic decision . . . they should show great respect for the faculty's professional judgement." Ewing, 474 U.S. at 225. We affirm the dismissal of Keefe's substantive due process claim.

**B.** Keefe further argues that Defendants violated his right to procedural due process, a more difficult issue. In Goss v. Lopez, 419 U.S. 565, 581 (1975), the Supreme Court held that even a short disciplinary suspension requires that the student "be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." In Horowitz, 435 U.S. at 80-82, a student was dismissed from medical school following extensive review by a Council on Evaluation in accordance with established university procedures that did not include a pre-dismissal hearing. The Supreme Court granted certiorari to review our decision that the dismissal was "effected without the hearing required by the fourteenth amendment." The student argued that procedural due process also required "the fundamental safeguards of representation by counsel, confrontation, and cross examination of witnesses." Id.

at 86 n.2. All Justices agreed that the university's elaborate procedures had complied with the procedural requirements of Goss. The Court further noted that "far less stringent procedural requirements" apply to an "academic" dismissal. Id. at 86. This dicta addressed a reality that did not affect the Court's procedural due process decision in Horowitz -- that academic dismissals, though accompanied by extensive procedural safeguards, often do not include a pre-dismissal face-to-face hearing between the student and academic decision-makers.

In this case, Keefe argues that he was removed from the Nursing Program for disciplinary reasons. Defendants respond, and the district court agreed, that the removal is properly characterized as academic, and therefore that "less stringent procedural requirements" apply -- namely, that due process was satisfied because CLC "fully informed [Keefe] of the faculty's dissatisfaction" and the ultimate academic decision was "careful and deliberate." Horowitz, 435 U.S. at 85; see Monroe, 495 F.3d at 595. In our view, while the distinction is important, as in Horowitz it has no bearing on whether Keefe was afforded procedural due process. He was removed from the Program for conduct that could have been the subject of a disciplinary proceeding, the kind of inquiry where "requiring effective notice and informal hearing permitting the student to give his version of the events will provide a meaningful hedge against erroneous action." Goss v. Lopez, 419 U.S. at 583; see Horowitz, 435 U.S. at 88-89. Thus, there is merit in Keefe's contention that procedural due process required more than the "careful and deliberate" decision-making Horowitz mandates for a strictly academic decision. However, Defendants afforded him a pre-removal, informal, face-to-face hearing that included an opportunity to respond. Whether that hearing led to an academic or a disciplinary removal is *procedurally* irrelevant.

"Due process is flexible and calls for such procedural protections as the particular situation demands." Mathews v. Eldridge, 424 U.S. 319, 334 (1976) (quotation omitted). When conduct that leads to an adverse academic decision is of

a disciplinary nature, due process *may* require the procedural protections of Goss v. Lopez in determining whether the student was guilty of the misconduct in question. Goss involved ten-day suspensions of public high school students. The Court's focus was necessarily on determining what *pre-suspension* process was due. 419 U.S. at 581 n.10. But where a public school provides additional, post-removal procedures, as here, the due process requisites for the pre-removal hearing "can vary, depending upon . . . the nature of the subsequent proceedings." Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 545 (1985) (quotation omitted). Where post-removal proceedings are available, a timely pre-removal meeting that affords the student an opportunity to be heard "serve[s] as the initial check against mistaken decisions that Loudermill requires." Sutton v. Bailey, 702 F.3d 444, 448 (8th Cir. 2012).

Viewed from this perspective, we conclude that Keefe, like the student in Horowitz, was "awarded at least as much due process as the Fourteenth Amendment requires." 435 U.S. at 85. Even if this was a purely disciplinary decision, as Keefe contends, he was entitled to "oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." Loudermill, 470 U.S. at 546. Keefe complains that Frisch did not inform him of her concerns before the meeting and did not let him read the posts at the meeting. But the constitutional requirement of procedural due process does not turn on such formalities. See Larson v. City of Fergus Falls, 229 F.3d 692, 697 (8th Cir. 2000). Due process does not require "a delay between the 'notice' and the 'opportunity to respond.'" Sutton, 702 F.3d at 448 (quotation omitted). Here, as in Sutton, Frisch met with Keefe, informed him that there were concerns regarding his Facebook, read from the posts of greatest concern, explained that his posts implicated the professionalism and professional boundary requirements of the Nursing Program, and gave him an opportunity to respond.

What is important is that Keefe admitted for summary judgment purposes that he authored the offensive posts -- meaning there were no material fact disputes -- and

was given an opportunity to respond -- which provided the predicate for Frisch's academic decision to dismiss him from the Program. Moreover, the notion that Keefe had inadequate notice of what the meeting would concern does not withstand scrutiny. After Keefe sent Frisch an email asking for more detail about the meeting, Frisch responded that "the topic of professional boundary is central to the role of the nurse and I am sure that you appreciate the delicacy of the topic." Keefe then made known to his clinical classmates there would be "hell to pay for whoever complained about me." When Frisch called Keefe and moved the meeting up one day, so that he would not be in his next clinical class with a student concerned about this threat, Keefe again asked what the meeting was about. Frisch again said she would prefer to discuss it in person but that due process would be followed. This was adequate informal notice.

Keefe also complains that he was not informed of the specific academic rules or standards the CLC administrators believed he had violated. This contention is factually without merit. Frisch explained at the meeting that his posts raised concerns about professionalism and professional boundaries that were clearly laid out in the student handbook, with cross-references to the Nurses' Code of Ethics -- codes and rules Keefe acknowledged receiving. Frisch knew that Keefe was entitled to appeal her initial decision; indeed, she advised Keefe of his appeal rights at the meeting. Frisch could reasonably assume that an appeal would include complete disclosure of the Facebook posts, if that became important to a procedurally adequate appeal process. See Sutton, 702 F.3d at 449. In these circumstances, the meeting at which Frisch advised Keefe there were concerns regarding specific Facebook posts that implicated professionalism and professional boundary requirements of the Nursing Program, and gave him an opportunity to respond, provided Keefe the "initial [pre-removal] check against mistaken decisions" that due process requires. Loudermill, 470 U.S. at 545.

After the meeting, Keefe filed an appeal in which he admitted "unethical and unprofessional behavior" without claiming he did not know the standards he had violated. On appeal, Keefe argues only that the pre-removal meeting with Frisch and Adams afforded him procedurally inadequate due process. Therefore, he failed to preserve any separate due process claim that his post-removal appeal to Vice President McCalla was procedurally inadequate. See Sutton, 702 F.3d at 449. Moreover, a claim of insufficient appeal procedures was foreclosed when Keefe admitted during the appeal that Frisch had properly found him guilty of "unethical and unprofessional behavior." See Morrissey v. Brewer, 408 U.S. 471, 490 (1972) ("If it is determined that petitioner admitted parole violations to the Parole Board . . . and if those violations are found to be reasonable grounds for revoking parole under state standards, that would end the [procedural due process] matter.").

Viewing the summary judgment record as a whole, we conclude that Keefe was provided sufficient notice of the faculty's dissatisfaction, an explanation of why his behavior fell short of the professionalism requirements of the Program, an opportunity to respond to the initial decision-maker, and an opportunity to appeal her adverse decision. Nothing in the record suggests that Keefe's removal from the Nursing Program was not a careful and deliberate, genuinely academic decision. Numerous prior decisions confirm that due process requires no more. See, e.g., Fenje v. Feld, 398 F.3d 620, 623 (7th Cir. 2005) (student dismissed from anesthesiology residency program for failing to disclose prior program dismissal after being "given the opportunity to respond and state his position"); Ku v. Tenn., 322 F.3d 431, 437 (6th Cir.) (student "was given -- and he took -- every opportunity to appeal the [academic] decision to the highest authorities at the College"), cert. denied, 540 U.S. 880 (2003); Richmond, 228 F.3d at 856-57 (same); Schuler, 788 F.2d at 514 (student had "prior notice of faculty dissatisfaction" and informal hearing before departmental grievance committee).

Finally, we reject Keefe's contention that "CLC's policies create an expectation" that he was entitled to a formal hearing process. If true, that expectation is an issue of state law, not of federal constitutional due process. See Horowitz, 435 U.S. at 92 n.8; Schuler, 788 F.2d at 516. Even if CLC's policies required a formal, contested case hearing under state law, "All that Goss required was an 'informal give-and-take' between the student and the administrative body dismissing him that would, at least, give the student the opportunity to characterize his conduct and put it in what he deems the proper context." Horowitz, 435 U.S. at 85-86 (quotation omitted).

The judgment of the district court is affirmed. Because we reject Keefe's constitutional claims on the merits, we need not address Defendants' alternative claim that they are entitled to a qualified immunity defense.

KELLY, Circuit Judge, concurring in part and dissenting in part.

This case highlights the evolving nature of students' First Amendment protection for speech on social media. While I disagree with the court's determination that Keefe was afforded procedural due process, I would affirm the district court on that issue because defendants are entitled to qualified immunity. However, because I think there is a genuine issue of material fact as to whether the school could constitutionally regulate Keefe's off-campus, non-academic speech, I would reverse the district court's grant of summary judgment in favor of defendants on Keefe's First Amendment claim.

## I. Due Process Claim

### A. Academic v. Disciplinary Dismissals

The court declines to characterize Keefe's dismissal as either academic or disciplinary, explaining that the distinction is procedurally irrelevant because Keefe received due process under either standard. I disagree. The Supreme Court has

explained that "[t]here is a clear dichotomy between a student's due process rights in disciplinary dismissals and in academic dismissals." Bd. of Curators of Univ. of Mo. v. Horowitz, 435 U.S. 78, 87 n.4 (1978) (quoting Mahavongsanan v. Hall, 529 F.3d 448, 450 (5th Cir. 1976)). The Due Process Clause imposes "less stringent procedural requirements in the case of an academic dismissal," id. at 86, recognizing that judges are ill-equipped to second-guess the academic judgment of school administrators.

But this hands-off approach is appropriate only when the school's decision is, in fact, academic. If, as the administrators contend, the reason for the dismissal was "the violation by a student of valid rules of conduct"—here, the College's Code of Conduct—the Supreme Court has said the dismissal is properly characterized as disciplinary, not academic. Id. at 86–90 (characterizing sanctions for "disruptive or insubordinate behavior" as disciplinary); see also Monroe v. Ark. State Univ., 495 F.3d 591, 595 (8th Cir. 2007) (recognizing that a dismissal for "alleged, but not conceded drug use, might constitute a disciplinary dismissal"); Pugel v. Bd. of Trs. of Univ. of Ill., 378 F.3d 659, 663–64 & n.4 (7th Cir. 2004) (collecting cases analyzing dismissals for academic dishonesty as disciplinary and assuming the same); Henson v. Honor Comm. of U. Va., 719 F.2d 69, 73–74 (4th Cir. 1983) (analyzing investigation of law student for alleged Honor Code violations as disciplinary). Both Frisch and the College's Dean of Students, Beth Adams, characterized a prior incident involving a verbal threat by another student against an instructor as non-academic. See Horowitz, 435 U.S. at 90.

The cases where we have characterized a dismissal as academic illustrate why Keefe's dismissal was not. The students in those cases were dismissed based at least in part on issues related to the school's curriculum, like failing to complete coursework, Monroe, 495 F.3d at 592–93; failing exams, lack of preparation, and absenteeism, Richmond v. Fowlkes, 228 F.3d 854, 858 (8th Cir. 2000); or cheating on an exam and then lying about it, Corso v. Creighton Univ., 731 F.2d 529, 532 (8th

Cir. 1984). These cases are consistent with Horowitz, which described an academic dismissal as one based on "failure to attain a standard of scholarship." Horowitz, 435 U.S. at 87 n.4 (quoting Mahavongsanan, 529 F.2d at 449–50). Keefe was dismissed as a result of a conflict with classmates on Facebook. Case law does not support classifying as "academic" dismissals based on off-campus speech that merely happened to be about the school or its students.

Furthermore, administrators treated Keefe's dismissal like a disciplinary one: They dismissed him immediately after learning of his Facebook posts, with no attempt to work with him to improve his conduct. Academic dismissals receive less stringent procedural protections in part because they involve an educational process that is "not by nature adversary." Horowitz, 435 U.S. at 90. In Horowitz, the decision to expel a medical student "rested on the academic judgment of school officials that she did not have the necessary clinical ability to perform adequately as a medical doctor and was making insufficient progress toward that goal," based on the fact that faculty had for two years expressed dissatisfaction with her clinical performance. Id. at 89–90. In contrast, Frisch reported that she was unaware of any prior professionalism problems involving Keefe. There is nothing in the record to suggest he had been told to improve his relations with his classmates or was reprimanded for previous behavior that his instructors thought unbecoming of a nurse. Rather than a cooperative, non-adversarial effort to improve Keefe's professionalism that proved unsuccessful over time, the dismissal was an immediate imposition of discipline for misbehavior.

The College's Code of Conduct sets forth such ostensibly academic goals as "Human Flourishing, Nursing Judgment, Professional Identity, and Spirit of Inquiry." It goes on to state that the College aims to instill in its graduates qualities like "evidence-based practice, life-long learning, service learning/civic engagement, caring, advocacy, excellence, and safe quality care for diverse patients within a family and community context." The Code of Conduct also requires students to uphold the

American Nurses Association Code of Ethics, which sets forth similar requirements. These goals are admirable, and describe commendable traits for a person entering the nursing profession. Yet with such general requirements of character, excellence, and virtue, it is difficult to imagine any type of misconduct that would not, in some way, violate one or more of these requirements. The court's holding allows the school to treat any action it deems violative of the Code of Conduct as an academic problem rather than a disciplinary problem. This interpretation collapses the distinction between academic and disciplinary dismissals, and I am not inclined to signal the end of the latter as a meaningful category.[7]

No doubt Keefe's attitudes toward his classmates left something to be desired. And no doubt all educational institutions, perhaps professional degree programs in particular, want to make sure that their future alumni treat their colleagues, clients, and the general public with respect. But a public college cannot transform a punishment for "disruptive or insubordinate behavior," Horowitz, 435 U.S. at 90, into an academic decision simply by declaring it an academic goal of the school to cultivate civility in its students. I would categorize Keefe's dismissal disciplinary, rather than academic, and therefore turn to the question of whether Keefe received sufficient process throughout his disciplinary expulsion proceedings.

---

[7]To be sure, I do not suggest that a dismissal must be based on poor grades or other objective indicia of subpar scholarship in order to qualify as "academic." As the Supreme Court has noted, "[p]ersonal hygiene and timeliness may be as important . . . in a school's determination of whether a student will make a good medical doctor as the student's ability to take a case history or diagnose an illness." Horowitz, 435 U.S. at 91 n.6. The concept of "professionalism" as a program requirement muddies the distinction between academic and disciplinary decisions. See, e.g., Al-Dabagh v. Case W. Reserve Univ., 777 F.3d 355, 359–60 (6th Cir. 2015); Ku v. Tenn., 322 F.3d 431, 436 (6th Cir. 2003); Hennessy v. City of Melrose, 194 F.3d 237, 250–51 (1st Cir. 1999). Therefore, the basis for a school's dismissal must have some connection to the qualities traditionally regarded as scholastic—not simply moral—before the laxer protections afforded to academic dismissals will apply.

**B. Process Required for Disciplinary Dismissal**

In Goss v. Lopez, the Supreme Court held that even a short disciplinary suspension requires that the student "be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." 419 U.S. 565, 581 (1975). Looking at the facts in the light most favorable to Keefe—as we must on an appeal from a grant of summary judgment against him—I think the notice he received was inadequate.

Timely and clear notice is a fundamental guarantee of the Due Process Clause, which "requires that some kind of prior notice be given." Navato v. Sletten, 560 F.2d 340, 345 (8th Cir. 1977). Even in the context of academic dismissals, which have less stringent procedural requirements than disciplinary dismissals, a student must have "prior notice of faculty dissatisfaction with his or her performance and of the possibility of dismissal." Schuler v. Univ. of Minn., 788 F.2d 510, 514 (8th Cir. 1986). Consistent with this principle, the College's Code of Conduct states that even for informal hearings, "*[p]rior to th[e] meeting*, the student shall be given written notice of the specific complaint against him/her and the nature of the evidence available to support the complaint and provided with a copy of the code of conduct." (emphasis added.) Formal hearings carry with them even more extensive requirements.

Keefe did not receive sufficient prior notice. He was not told the purpose of his meeting with Frisch prior to the time of meeting, much less the evidence against him. The decision to dismiss him was made at the meeting itself—if not before—without giving him time to review the posts and formulate a considered defense. Frisch did not allow Keefe to read copies of the offending Facebook posts at the meeting. And McCalla conceded that he provided Keefe with printed copies

of the Facebook posts only after Keefe had appealed his dismissal. Since those present at the initial disciplinary meeting disagree as to which posts were discussed there,[8] it is possible that Keefe went through the entire disciplinary process without knowing exactly which Facebook posts led to his dismissal. Finally, the undisputed facts do not establish that anyone told Keefe which specific rule or Code provision he allegedly violated.

It is true that in Goss the Supreme Court stated that "[t]here need be no delay between the time 'notice' is given and the time of the hearing." 419 U.S. at 582. But, it also cautioned that it was addressing itself "solely to the short suspension, not exceeding 10 days" and that "the timing and content of the notice and the nature of the hearing will depend on appropriate accommodation of the competing interests involved." Id. at 579, 584. It went on to elaborate that "[l]onger suspensions or expulsions for the remainder of the school term, or permanently, may require more formal procedures." Id. at 584. Here, Keefe faced expulsion from the nursing program, and he was entitled to adequate notice before the hearing[9] unless the school

[8]Indeed, the parties dispute whether Frisch brought up the post she later testified she was "most disturbed by" during the meeting—the post referencing a hemopneumothorax.

[9]The court cites Cleveland Board of Education v. Loudermill, 470 U.S. 532, 545 (1985), and Sutton v. Bailey, 702 F.3d 444, 448 (8th Cir. 2012), for the proposition that Goss's procedural protections *may* be required in the event of "an academic decision of a disciplinary nature," but that the extent of the pre-dismissal procedure required depends on whether additional, post-dismissal procedure is provided. However, Loudermill and Sutton do not address due process in the context of school disciplinary action, and do not abrogate the "clear dichotomy between a student's due process rights in disciplinary dismissals and in academic dismissals," Horowitz, 435 U.S. at 87 n.4 (quoting Mahavongsanan, 529 F.2d at 450)—a distinction that made a significant difference in the process available to Keefe. Specifically, Keefe was not afforded a formal appeal hearing precisely because the school deemed his dismissal "academic" rather than "disciplinary." Loudermill and

can provide good reasons why that would have been inadvisable.[10] See Mathews v. Eldridge, 424 U.S. 319, 335 (1976) (holding that "the fiscal and administrative burdens that the additional or substitute procedural requirement would entail" must be considered in determining what due process requires).

These flaws in the disciplinary process were not rendered harmless by Keefe's admission on appeal that he wrote at least some of the Facebook posts in question and concession that they were unprofessional. Keefe asserts he only knew about the administration's concerns with two of his posts at the time he appealed; he may well have declined to make similar concessions with respect to any other posts on which Frisch based her decision. Also, the fact that Keefe admitted wrongdoing on appeal does not necessarily mean he would have done the same at the initial meeting, had he been given adequate notice and time to deliberate. With sufficient opportunity to prepare, he might have presented evidence in support of another defense: for example, that it was clear from the context that his Facebook posts were meant to be humorous, that other students had made similar posts without being disciplined, or that the printouts used by Frisch and McCalla did not accurately reflect what he had written. But more fundamentally, the idea that the problems with the constitutionally inadequate process Keefe received are excusable simply because it happened to arrive

---

Sutton do not affect the "rudimentary procedures" mandated by Goss. Goss, 419 U.S. at 584. Defendants were obligated to provide Keefe with pre-removal notice and opportunity to be heard. Here, in a case involving a punishment more severe than the suspensions in Goss, they failed to provide that notice.

[10]The only reasons Frisch gave for not telling Keefe the purpose of the meeting beforehand were that she had never done so with other students—which, of course, simply raises the question of why not—and that she was concerned that Keefe would change his Facebook page before the meeting. Yet Frisch had already received printed copies of the posts from Scott (who got them from one of the students who complained about Keefe) and accessed the Facebook page to verify that the posts did in fact exist.

at the correct result mistakes the right that the Due Process Clause protects. "[T]he right to procedural due process is 'absolute' in the sense that it does not depend upon the merits of a claimant's substantive assertions . . . ." Carey v. Piphus, 435 U.S. 247, 266 (1978). It is the fairness of the process that was deficient here, even if the substantive outcome of the process was correct.

**C. Qualified Immunity**

Nevertheless, I would hold that the administrators are entitled to qualified immunity on Keefe's due process claim, and are thus shielded from Keefe's claim to money damages, though not his request for an injunction. See Burnham v. Ianni, 119 F.3d 668, 673 n.7 (8th Cir. 1997) (en banc). A government official "is entitled to qualified immunity unless (1) the evidence, viewed in the light most favorable to the nonmoving party, establishes a violation of a federal constitutional or statutory right, and (2) the right was clearly established at the time of the violation." Robinson v. Payton, 791 F.3d 824, 828 (8th Cir. 2015). In order to be "clearly established," a right's contours must have been "sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." Plumhoff v. Rickard, 134 S. Ct. 2012, 2023 (2014). While there need not be a prior case finding a constitutional or statutory violation on identical facts in order for the right to be clearly established, Williams v. Jackson, 600 F.3d 1007, 1013 (8th Cir. 2010), the Supreme Court has enjoined us not to "define clearly established law at a high level of generality," but rather to ask whether "existing precedent . . . placed the statutory or constitutional question beyond debate," Ashcroft v. al-Kidd,563 U.S. 731, 741–42 (2011).

What precludes a finding that the administrators violated clearly established due process rights is the dearth of prior decisions classifying expulsions of professional students as academic or disciplinary, and the lack of uniformity in the decisions that do exist. As the preceding discussion and the cases cited therein

suggest, student dismissals are not self-categorizing, and there was no controlling authority in this jurisdiction or a "consensus of cases of persuasive authority" in others on which the administrators could have relied to determine whether they should be held to the standards of disciplinary, as opposed to academic, dismissals. Wilson v. Layne, 526 U.S. 603, 617 (1999). "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." Scott v. Baldwin, 720 F.3d 1034, 1036 (8th Cir. 2013) (quoting Davis v. Hall, 375 F.3d 703, 712 (8th Cir. 2004)).

Accordingly, I would hold that the administrators are not entitled to summary judgment on the merits of Keefe's due process claim, but that they are entitled to summary judgment on their qualified immunity defense.

## II. First Amendment Claim

Colleges and universities are free to encourage professionalism by adopting codes of conduct that impose restrictions on student speech, provided those restrictions do not run afoul of the First Amendment. "[T]he precedents of [the Supreme] Court leave no room for the view that, because of the acknowledged need for order, First Amendment protections should apply with less force on college campuses than in the community at large." Healy v. James, 408 U.S. 169, 180 (1972); see also Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 828–30 (1995); Widmar v. Vincent, 454 U.S. 263, 269–70 (1981); Papish v. Bd. of Curators of Univ. of Mo., 410 U.S. 667, 669–70 (1973) (per curiam).

Restrictions on student speech do not violate the First Amendment when educators exercise "editorial control over the style and content of student speech" that is "school-sponsored," provided "their actions are reasonably related to legitimate pedagogical concerns." Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 273 (1988). Here, Keefe's speech was off-campus, was not school-sponsored, and cannot

be reasonably attributed to the school.[11] Hazelwood's "reasonably related to legitimate pedagogical concerns" test is therefore inapplicable in this case. See Morse v. Frederick, 551 U.S. 393, 405 (2007) (holding that Hazelwood "does not control this case because no one would reasonably believe that [a student's] banner bore the school's imprimatur"); Keeton v. Anderson-Wiley, 664 F.3d 865, 882 (11th Cir. 2011) (Pryor, J., concurring) ("Hazelwood does not allow retaliation against disfavored speech that occurs outside the classroom."); Morgan v. Swanson, 659 F.3d 359, 408–09 (5th Cir. 2011) (en banc) ("Like all exceptions to the First Amendment's protections, the Hazelwood exception should be construed narrowly."); Saxe v. State Coll. Area Sch. Dist., 240 F.3d 200, 213–14 (3d Cir. 2001) (Alito, J.) ("Hazelwood's permissive 'legitimate pedagogical concern' test governs only when a student's school-sponsored speech could reasonably be viewed as speech of the school itself[.]").

However, even when speech is not school-sponsored or reasonably attributable to the school, institutions may regulate some student speech that occurs in class or on campus without violating the First Amendment. See Morse, 551 U.S. at 405 (distinguishing Bethel Sch. Dist. No. 403 v. Fraser, 478 U.S. 675 (1986)) ("Had Fraser delivered the same [offensively lewd and indecent] speech in a public forum outside the school context, he would have been protected."); Oyama, 813 F.3d at 872

---

[11] The fact that Keefe was a college student also cautions against too lenient an interpretation of his First Amendment protections. Restrictions permissible in secondary schools may be impermissible at post-secondary institutions because "[f]ew college students are minors, and colleges are traditionally places of virtually unlimited free expression." Bystrom ex rel. Bystrom v. Fridley High Sch., 822 F.2d 747, 750 (8th Cir. 1987); see also Hazelwood, 484 U.S. at 273 n.7 (reserving question of whether greater deference is appropriate at the college and university level); Oyama v. Univ. of Haw., 813 F.3d 850, 871–72 (9th Cir. 2015); McCauley v. Univ. of the V.I., 618 F.3d 232, 242, 242–47 (3d Cir. 2010); Kincaid v. Gibson, 236 F.3d 342, 346 n.5, 352 (6th Cir. 2001) (en banc); Student Gov't Ass'n v. Bd. of Trs. of Univ. of Mass., 868 F.2d 473, 480 n.6 (1st Cir. 1989).

(permitting denial of student's application "based . . . only upon statements [the student] made in the context of the certification program—in the classroom, in written assignments, and directly to the instructors responsible for evaluating his suitability for teaching").[12]

The court relies heavily on the school's ability to impose a code of ethics as an "academic" requirement, and explains that, "because compliance with the Nurses Association Code of Ethics is a legitimate part of the Associate Nursing Program's curriculum, speech reflecting non-compliance with that Code that is related to academic activities 'materially disrupts' the Program's 'legitimate pedagogical concerns.'" Supra at 12 (citing Keeton, 664 F.3d at 876, for reliance on Hazelwood's framework).[13] However, we are not faced with a situation where the school is punishing a student's failure to abide by rules of conduct akin to a professor's marking down a student for what he says as part of an academic assignment. Cf. Healy, 408 U.S. at 191–94 (permitting college to withhold recognition from groups unwilling "to be bound by reasonable school rules governing conduct"); C.H. ex rel. Z.H. v. Oliva, 226 F.3d 198, 211 (3d Cir. 2000) (Alito, J., dissenting) (explaining that because a classroom can be thought of as a government-owned forum, "if a student is asked to solve a problem in mathematics or to write an essay on a great American poet, the student clearly does not have a right to speak or write about the Bible instead"). Keefe's Facebook posts were not made as part of fulfilling a program requirement and did not express an intention to break specific curricular rules. See

[12]The Ninth Circuit's opinion in Oyama was issued after this appeal was taken.

[13]While I agree Keefe could have been disciplined for speech that qualified as a "true threat" or a "substantial disruption," the district court made no findings with respect to whether Keefe's Facebook posts qualified for these categorical exceptions to the First Amendment. See, e.g., Watts v. United States, 394 U.S. 705, 708 (1969) (per curiam) (true threat); Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 504, 514 (1969) (substantial disruption of school activities or invasion of the rights of others).

Keeton, 664 F.3d at 868–71, 873–75 (permitting university to require student to complete remediation plan before participating in clinical practicum because she told classmates and professors she planned to violate practicum rules); Axson-Flynn v. Johnson, 356 F.3d 1277, 1289 (10th Cir. 2004) (finding Hazelwood's framework "applicable in a university setting for speech that occurs in a classroom *as part of a class curriculum*." (emphasis added)); Brown v. Li, 308 F.3d 939, 947–52 (9th Cir. 2002) (opinion of Graber, J.) (concluding in an opinion not joined by other panel members that Hazelwood permits an educator to "require that a student comply with the terms of an academic assignment" while acknowledging that courts "have held that Hazelwood deference does not apply" to extracurricular activities). Furthermore, Oyama affirmatively rejects the notion that students can be disciplined based on speech unrelated to the fulfillment of a curricular requirement. See Oyama, 813 F.3d at 872 (emphasizing the fact that "[t]here [was] no evidence that the University relied upon any statements Oyama may have made outside [the context of his certification program] or communicated to a broader audience" in denying his student teaching application).

The Supreme Court's decisions in Morse and Fraser foreclose the court's contention that Keefe's posts are equivalent to curricular speech simply because they were directed at classmates and involved their conduct in the Nursing Program. Fraser involved a speech by a high school student nominating a fellow student for student elective office, during which he "referred to his candidate in terms of an elaborate, graphic, and explicit sexual metaphor." Fraser, 478 U.S. at 677–78. Although this speech was clearly directed at classmates and school-related, the Supreme Court went out of its way in Morse to underscore that Fraser's speech would have been protected if it had been delivered outside of school. Morse, 551 U.S. at 405; see also J.S. ex rel. Snyder v. Blue Mountain Sch. Dist., 650 F.3d 915, 925–33 (3d Cir. 2011) (en banc) (holding that First Amendment barred school from punishing student for vulgar MySpace post concerning principal because it was off-campus speech); Layshock ex rel. Layshock v. Hermitage Sch. Dist., 650 F.3d 205, 211–19

(3d Cir. 2011) (en banc) (same). Similarly, Keefe's mere use of a word we associate with medical training does not make his post equivalent to curricular speech—such a finding would sweep far too broadly.

The College and the district court felt that Keefe's Facebook posts constituted "behavior unbecoming of the profession and transgression of professional boundaries," in violation of the Code of Conduct. Keefe's statements may indeed violate the administrators' interpretation of certain provisions of the College's professionalism Code, but that does not answer the question of whether that interpretation is consistent with the First Amendment. See United States v. Alvarez, 132 S. Ct. 2537, 2544 (2012) (plurality opinion) (quoting United States v. Stevens, 559 U.S. 460, 470 (2010)) (The Supreme Court "has rejected as 'startling and dangerous' a 'free-floating test for First Amendment coverage . . . [based on] an ad hoc balancing of relative social costs and benefits.'") (alteration in original). Quite simply, Code requirements that nurses treat others with "respect and compassion" and avoid "any and all forms of prejudicial actions" or "disregard for the effect of one's actions on others" could easily be used to restrict protected speech. See, e.g., McCauley, 618 F.3d at 247–52 (concluding that provisions of university's Code of Conduct that prohibited "conduct which causes emotional distress" and "offensive signs" were unconstitutionally overbroad); DeJohn v. Temple Univ., 537 F.3d 301, 317–20 (3d Cir. 2008) (public university's policy that sought to forbid "gender-motivated" conduct that had the purpose of "creating an intimidating, hostile, or offensive environment" held unconstitutional); Papish, 410 U.S. at 667–70 & n.2 (holding that university violated First Amendment by expelling student for printing indecent newspaper despite student code prohibiting "indecent conduct or speech"). In addition, when a college applies a generalized Code of Conduct to speech after the fact, I question whether students like Keefe are provided sufficient notice of what the Code prohibited and what it allowed. Cf. Lacks v. Ferguson Reorganized Sch. Dist. R-2, 147 F.3d 718, 723–24 (8th Cir. 1998).

A number of long-standing First Amendment doctrines leave public schools and universities ample room to discipline students based on what they say on campus or in academic assignments. See Morse, 551 U.S. at 422–23 (Alito, J., concurring) (listing these doctrines).[14] The majority of the cases relied on by the court involve discipline of this sort. See Oyama, 813 F.3d at 872; Ward v. Polite, 667 F.3d 727, 733 (6th Cir. 2012); Keeton, 664 F.3d at 876. But see Tatro v. Univ. of Minn., 816 N.W.2d 509, 521 (Minn. 2012).[15] But these traditional exceptions do not apply to off-campus speech unrelated to academic assignments, like Keefe's Facebook posts. See Bystrom, 822 F.2d at 750 (explaining that in comparison with regulating speech on school grounds, the burden to justify restrictions on off-campus speech "would be much greater, perhaps even insurmountable").

Based on the record before us, I think that summary judgment was improperly granted to the administrators on Keefe's First Amendment claim. Genuine issues of

---

[14]The votes of Justices Alito and Kennedy were necessary to the majority opinion and expressly conditioned on the understanding of the majority opinion laid out in Justice Alito's concurrence, so the concurrence is controlling. See Marks v. United States, 430 U.S. 188, 193 (1977) (explaining that when "no single rationale explaining the result [of a case] enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds'") (quoting Gregg v. Georgia, 428 U.S. 153, 169 n.15 (1976) (opinion of Stewart, Powell, and Stevens, JJ.)).

[15]While Tatro is factually similar to this case in some ways, I question whether it is consistent with binding Supreme Court precedent. See Williams-Yulee v. Florida Bar, 135 S. Ct. 1656, 1666–67 (2015) ("[A] history and tradition of regulation are important factors in determining whether to recognize 'new categories of unprotected speech.'") (quoting Brown v. Entm't Merchs. Assn., 564 U.S. 786, 791 (2011)); Reed v. Town of Gilbert, 135 S. Ct. 2218, 2229 (2015) (rejecting notion that more permissive First Amendment standard was justified by state's interest in the "regulation of professional conduct") (quoting NAACP v. Button, 371 U.S. 415, 438 (1963)).

material fact remain concerning whether the administrators could permissibly restrict the speech at issue in this case in the manner that they did.

---